Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Robert W. Gettleman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 00 C 7488 | DATE | 6/1/2001 |
| CASE TITLE | James Holden, et al v Delooitte & Touche, LLP, et al | | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5)   Status hearing held.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Memorandum opinion and order entered. Accordingly, under 9 U.S.C. §3, defendants' motion to stay and compel arbitration are granted.

(11) ☒ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | number of notices | Document Number |
| X | Notices mailed by judge's staff. | | JUN 0 4 2001 | |
| | Notified counsel by telephone. | | date docketed | 66 |
| | Docketing to mail notices. | ED-7 FILED FOR DOCKETING | docketing deputy initials | |
| | Mail AO 450 form. | 01 JUN -1 PM 5:02 | | |
| | Copy to judge/magistrate judge. | | date mailed notice | |
| GDS | courtroom deputy's initials | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DAVID HOFFMAN and HOFFMAN INVESTMENT, INC., <br><br> Plaintiffs, <br><br> v. <br><br> DELOITTE & TOUCHE, LLP. and JEFFERIES & COMPANY, INC, <br><br> Defendants. | No. 00 C 7412 <br><br> Judge Robert W. Gettleman <br><br> **DOCKETED** <br> JUN 0 4 2001 |
| JAMES HOLDEN and CHRISTINE HOLDEN, <br><br> Plaintiffs, <br><br> v. <br><br> DELOITTE & TOUCHE, LLP. and JEFFERIES & COMPANY, INC.; JEFFREY WEINHUFF; CHRISTOPHER P. MASSEY; DAVID M. EHLEN; ERIK R. WATTS; WALTER L. SCHINDLER; MARK C. COLEMAN; EPS SOLUTIONS CORP.; ENTERPRISE PROFIT SOLUTIONS CORP., <br><br> Defendants. | No. 00 C 7488 <br><br> Judge Robert W. Gettleman |

### MEMORANDUM OPINION AND ORDER

In these related cases, plaintiffs David Hoffman and Hoffman Investment Company, Inc. ("Hoffman"), and James and Christen Holden ("Holdens") have filed separate lawsuits alleging that they were fraudulently induced to sell their companies as part of a large "roll-up" to a newly created company called EPS Solutions Corp. ("EPS"). Hoffman has named as defendants Deloitte & Touche, LLP ("D&T"), a national and international public accounting limited liability

partnership, and Jefferies & Company, Inc. ("Jefferies"), an investment banking firm. In addition to D&T and Jefferies, the Holdens have named Jeffery Weinhuff, Executive Vice President of Jefferies and later an officer of EPS; Christopher P. Massey, until December 14, 1998, Senior Partner at D&T and thereafter CEO of EPS; David H. Ehlen, Senior Partner and National Director of D&T until December 14, 1998, and thereafter an employee and officer of EPS; Erik R. Watts, an associate of Massey and starting in December 1998 an officer and director of EPS; Walter L. Schindler, a Senior Partner at the law firm of Gibson, Dunn & Crutcher, LLC. until January 10, 1999, and thereafter General Counsel and Vice President of EPS; Mark C. Coleman, a partner at D&T until December 14, 1998, and thereafter Senior Vice President and CFO of EPS; EPS, and its operating company Enterprise Profit Solutions Corp.

D&T and Jefferies have moved in both cases to dismiss or stay the proceedings and compel arbitration. Massey and Watts have adopted D&T's motion in the Holden case. For the reasons set forth below, the motions are granted.

## Background

The complaints in these cases allege a complex fraudulent scheme conducted by D&T and Jefferies, and others acting in concert with them, to form and operate EPS, a company comprised of numerous entities that are or were engaged in various business service fields including: disbursement management services; corporate training; health care claims recovery; outsourcing; recruiting; and benefit consulting. Because an understanding of the basic scheme as well as each defendant's individual role is necessary for resolution of the pending motions, the court provides both a general description of the scheme as well as an abbreviated version of the extensive allegations regarding its creation and the plaintiffs' involvement.

In general, the complaints allege that D&T, together with Jefferies, Weinhuff, Massey, Ehlen, Watts, Schindler and Coleman, organized and implemented a "roll-up" of companies to become part of EPS. Many of the rolled-up companies were economically unviable and were included to make EPS appear viable, to obtain financial support from banks, to amass stocks for the defendants to cash in once EPS instituted its initial public offering ("IPO"), and to attract successful companies such as plaintiffs that would provide cash to keep EPS afloat until defendants could cash in on the IPO. Defendants allegedly induced plaintiffs and others to sell companies to EPS by hyping EPS's rosy future and touting the IPO, when they knew that as of the first quarter of 1999, EPS was short $10 million in earnings before interest, taxes, depreciation, and amortization as required by EPS's credit agencies, that EPS was in desperate need of cash, and that no successful IPO was possible until 2000 or later. EPS ultimately collapsed, allegedly under the weight of the economically unviable rolled-up companies and defendants' other illegal actions.

## Facts[1]

In 1995 D&T formed a division called Integrated Cost Reduction Strategies Group ("ICRS") to provide business services to its audit clients. Massey, a D&T partner, was made Managing Partner of ICRS, and reported to an advisory board consisting of the managing partner of D&T as well as the function heads and other top D&T partners. Coleman was made CFO and National Director of ICRS's health care service group.

---

[1] This fact section is comprised of a compilation of the allegations of the two complaints, the truth of which are assumed for purposes of this motion only.

3

Because the Security and Exchange Commission and American Institute of Certified Public Accountant regulations prohibited D&T from receiving performance-based or "contingency" fees, D&T contracted with an intermediary firm, National Benefits Consultants, LLC. ("NBC"), which then contracted with separate companies called "Alliance Members" to perform a majority of the services at ICRS's direction. NBC received a portion of the contingency fees for the services provided by the Alliance Members, and then itself paid most of that fee, ostensibly as payment for "time and materials," to ICRS. These "time and materials" fees were then passed on to the local D&T office that had referred the audit client. In fact, neither ICRS nor D&T provided any time or material; they simply used D&T referrals to channel contingent fee work to third party companies.

NBC, founded in 1995, was a shell corporation nominally owned by Watts, but Massey owned an undisclosed option to purchase a one-half ownership interest for $1. Because Massey was a D&T partner, the undisclosed option was intended to disguise D&T's financial interest in and control over NBC, to give the appearance to clients and regulators that NBC's contingent fee activities were unconnected to D&T.

Because the contract providing for the funneling of work and revenue between NBC and ICRS was scheduled to expire on December 31, 1998, and because D&T desired to distance itself further from the contingent fee and "money laundering" aspects of the ICRS/NBC relationship, Massey proposed that D&T engineer a "roll-up", combining numerous third party cost-recovery and consulting companies into a new enterprise (EPS), which would be used as a vehicle to borrow money from the Bank of America and other lenders. The money would then be used to purchase ICRS from D&T at an inflated price, and to purchase various cost-recovery and

consulting companies. Alan Bernikow, Massey's direct supervisor at D&T, and the rest of D&T's management accepted Massey's proposal.

D&T provided virtually all of EPS's capital and funded its promotional, payroll and operating expenses both before and after EPS was created up until the date of the initial roll-up, December 14, 1998. D&T employees, including Massey, Ehlen, and Coleman, made up EPS's staff but remained employees of D&T until the date of the roll-up, at which time they became full time EPS employees.

D&T promoted and controlled EPS through Massey, Coleman, Ehlen, Bernikow and other senior partners as part of an advisory board. Massey reported directly to Bernikow and to other D&T senior partners regarding the method, procedure, and details of the roll-up. Although still employed by and working on behalf of D&T, Massey signed an employment agreement effective August 28, 1998, indicating that his role was also "CEO" of EPS Solutions Corp. As CEO, Massey was in charge of structuring the roll-up, supervising due diligence, and identifying prospects such as plaintiffs. Massey took the lead in recruiting principals of companies such as plaintiffs on behalf of D&T. On December 7, 1998, Massey was formally named CEO and Chairman of the Board of Directors of Enterprise Profit Solution Corporation. Ehlen and Coleman also became full time corporate officers of EPS.

To make the roll-up appear legitimate, D&T required an investment banker. D&T named Jefferies, described by the Holdens as "an otherwise reputable firm," to be a "Founder" of the roll-up and to handle the investment banking role. Jefferies acted as a financial advisor and investment banker for EPS from early 1998 through early 1999. The relationship between Jefferies and EPS was memorialized in a letter agreement dated October 2, 1998, between NBC

and promoters Watts, Massey and Coleman, and Jefferies. Both before and during the time period covered by the engagement letter, Jefferies, one of the founders of EPS, acted as promoter of the roll-up through its employees. Weinhuff, Jefferies' Chief of the High Yield Bond Division, who was the primary agent on the account, took the most active roll in soliciting companies to join the roll-up through presentations to owners of potential acquisitions. Weinhuff was recruited into the scheme by promises of extremely high finders fees, to be paid in cash and stock of EPS (the "arbitrage shares").

During the summer of 1998 through mid-March 1999, D&T, Massey, Watts, Ehlen, Coleman, Weinhuff, Schindler, and Jefferies represented to owners of potential roll-up companies, including plaintiffs, that Jefferies's financial advice and due diligence was full, thorough, accurate, and complied with all professional and legal standards. According to plaintiffs, however, Jefferies's real due diligence checks were limited to the few bona fide companies involved in the roll-up, such as plaintiffs. Plaintiffs allege that Jefferies performed no due diligence on Massey's and Watts' sham and overvalued companies or on ICRS and NBC. Jefferies concealed the truth about those companies being included in the roll-up and concealed that Jefferies' officer, Weinhuff, had a personal interest in the roll-up. Jefferies also concealed Massey's and Watts's personal interest in self dealing and the excessive prices paid to D&T for ICRS, and to Massey and Watts for NBC.

Jefferies generated over $11 million in fees paid by EPS out of bank loans EPS obtained to fund the roll-up. Weinhuff received approximately 2,025,135 arbitrage shares of EPS stock and a $400,000 bonus paid by Jefferies for his work in connection with the roll-up. Immediately following the roll-up Weinhuff became an officer of EPS.

D&T employees, including Massey and Ehlen, as well as Jefferies and Weinhuff, prepared or supervised the preparation of written promotional materials used to solicit potential roll-up companies. Most of the promotional materials were prepared on D&T letterhead. D&T and Jefferies also gave oral presentations, supported by the written materials and visual aids, to entice potential companies to participate in the roll-up.

Once agreeing to participate in the roll-up, each roll-up company signed a letter of intent to sell either its assets or stock to EPS. In exchange, the roll-up company's principals would receive stock in EPS and, in some cases, cash and notes. In assembling companies for the roll-up, D&T, through Massey, included ICRS and NBC, legitimate operating companies such as plaintiffs, with significant expertise in corporate management advisory services, and companies owned by Massey and Watts, and other defendants and coconspirators, that were either nearly defunct or that only recently had been established for the sole purpose of being included in the roll-up.

The purpose of including unprofitable, nearly defunct, and new companies was to make EPS appear more substantial than it actually was so that bona fide business owners such as plaintiffs would agree to participate, to justify additional borrowings from lending institutions, and to justify payments of cash, commissions, notes and "arbitrage shares" to Massey, Watts, Weinhuff and others.

For each company rolled-up, Massey, Watts, and Weinhuff allocated to themselves and ultimately received arbitrage shares in EPS, which represented all or a portion of the purported value added to EPS by that company beyond what the principals received for that value. These shares received by Massey, Watts and Weinhuff were in addition to the shares they received as

owners of some of the rolled-up companies. In total Massey received approximately 5,032,898 shares, Watts 5,032,898 shares and Weinhuff over 2 million shares. At a proposed IPO price of $35, that stock would now be worth at least $176 million each to Massey and Watts, and $70 million to Weinhuff.

The defendants colluded together to determine the terms of EPS's acquisition of ICRS owned by D&T, and NBC owned by Watts. In November 1998, Massey met with Bernikow, and Weinhuff and others of Jefferies, to fix the roll-up price of ICRS. At that meeting, Massey acted on both sides of the transaction, as CEO of the buyer, EPS, and as senior partner of the seller, D&T. Bernikow, Massey and Weinhuff arbitrarily set the price for ICRS at $18 million cash plus $13 million in subordinated notes. According to the complaints, the defendants arrived at this price with no regard for the value of ICRS as a business entity or otherwise. An independent firm charged with determining ICRS's fair market value set the value at only $4.8 to $5.8 million. Massey, Bernikow and Weinhuff determined ICRS's price by totaling: 1) D&T's losses since establishing ICRS; 2) a desired bonus pool to be paid to ICRS's employees moving to EPS; and 3) $1 million to be paid into a "foundation" being established by Massey. Those elements made up the $18 million cash portion of the purchase price. The $13 million note was to be D&T's "profit." Plaintiffs allege that at no time were they advised as to how the ICRS price was determined and that the ICRS sale was not an arms-length transaction.

At the same time that he was helping to set the price for EPS, Massey negotiated the price for NBC. In that negotiation, Massey was both buyer as CEO of EPS, and seller as a "secret" fifty percent owner of NBC. The total price for NBC was set at $1,713,110 in cash, $18,267,000

8

in subordinated notes, and 1,670,269 shares of EPS. Defendants did not disclose this information to plaintiffs or other potential investors.

D&T ratified and supported the scheme proposed by Massey by participating actively both before and after the closing of the first phase of the roll-up on December 14, 1998, and by allowing Massey, Watts and other promoters of the scheme to use D&T fax machines, offices, letterhead and other indicia to inform the world at large (and plaintiffs in particular) that the entire deal was sponsored and supervised by D&T.

In the spring of 1998, the Holdens were advised through a business broker of the opportunity to participate in a "roll-up" promoted by D&T and financed by Bank of America. In November 1998, the Holdens agreed to meet with D&T to discuss possible participation. Among the materials D&T furnished to the Holdens were a April 16, 1998, "ICRS Roll-Up Proposal" and a June 4, 1998, "Profitsource Information Summary,"[2] both bearing the D&T name and logo.

On December 10, 1998, the Holdens met with Ehlen, Weinhuff and Massey at D&T's Orange County, California offices. At that time Massey was the Senior Partner at D&T and CEO of ICRS and had been CEO of EPS since August. At that meeting the D&T representatives indicated that D&T was firmly aligned with the roll-up venture, which promised the component companies access to greater resources, capital, client base and synergies afforded by D&T's worldwide context. Massey made factual statements to the Holdens that D&T was "aligned with this new venture," and that the venture had access to D&T clients, offices and facilities throughout the world. According to plaintiffs, that statement by Massey, made on behalf of D&T

---

[2] EPS was originally known as Profitsource.

9

in his capacity as Senior Partner at D&T and as one of the promoters of the roll-up, was false. In fact, there existed no agreement requiring D&T to provide ongoing support for EPS.

Other similar false statements as to the existence of an alliance with D&T and about EPS's ability to rely on future business from D&T were made to the Holdens in a series of handouts and other documents. By December 1998, documents faxed by D&T to the Holdens entitled "EPS Solutions, Questions and Answers," stated: "we have a five year, nonexclusive strategic alliance with Deloitte and Touche. This allows us to work on common clients of EPS and D&T when it best serves clients needs." According to the Holdens, that statement was also false.

In addition to D&T's representations concerning an alliance with EPS, Weinhuff, on behalf of Jefferies, Massey, on behalf of D&T, and Ehlen, on behalf of EPS, stated at the December meeting that all companies participating in the roll-up were "top-of-the-line" companies with at least three years of operations and financial histories showing for the last three years at least twenty percent growth and twenty percent profit margins. The Executive Summary given to the Holdens stated that each entity had "been through due diligence by D&T-ICRS professionals to determine their qualifications . . . [U]nlimited capacity, excellent references, and demonstrated profitability with criteria for participation." Few of the roll-up companies met that standard, however, and many were not profitable, and had undergone no meaningful due diligence, facts that were know to Massey, Weinhuff, Coleman, Ehlen, D&T, Jefferies and Schindler.

At the December 10, 1998, meeting, Ehlen, Weinhuff and Massey all represented to the Holdens that each company being rolled-up would be valued by the same formula. That

statement was false, because of the artificially inflated prices of ICRS and NBC, and because several other companies included in the roll-up had different or better terms than those offered to the Holdens. Additionally, Weinhuff, Massey and Ehlen also stated that no EPS executive's compensation would exceed $250,000 because EPS management was relying on the anticipated IPO to be conducted soon after the roll-up, and that the expected IPO offering price for EPS stock was to be $35 per share. The written materials prepared by or under the supervision of D&T, Massey, Coleman and Ehlen, and Jefferies's Weinhuff, made the same representations. The representations with respect to executive compensation and an early IPO were false and were known to be false by Massey, Weinhuff, Ehlen, Schindler, D&T and Jefferies. Massey, Ehlen, Schindler and others had salaries up to $500,000. Moreover, all defendants knew, having been informed in a November 1998 meeting with Ernst & Young, that no successful IPO could occur before the year 2000 because of EPS's financial condition and the SEC's "Cheap Stock Rule."

Negotiations continued with the similar misrepresentations made to the Holdens to induce them to sell Holden Corp. to EPS. Ultimately the Holdens entered into a stock purchase agreement with EPS on March 1, 1999, after having executed a non-binding letter of understanding at the December 10, 1998, meeting.

The initial roll-up occurred on December 14, 1998, at which time EPS acquired several companies including plaintiff HIC.[3] The alleged misrepresentations continued, however, even after the initial roll-up. On January 7, 1999, through January 10, 1999, EPS held its first "President's Council meeting" in California. Massey, now CEO of EPS, Weinhuff, Senior

---

[3]Because the Holdens' December 10, 1998, meeting with defendants was so close in time to the December 14, 1998, initial roll-up date, the Holdens did not participate in the initial phase.

11

Partner at Jefferies, Coleman, CFO of EPS, and Schindler, representing Gibson Dunn, addressed the attendees, who were predominately former owners of companies that had been rolled-up on December 14, 1998, or, like the Holdens, owners of companies that were considering merging.

Massey represented that EPS was growing and that the price per share was likely to reach $50. Massey further stated that the IPO was to take place within a month or two. These representations were false, because no successful IPO was possible before the year 2000.

At that meeting, Massey again represented an alliance in fact existed between D&T and EPS, and that D&T would be a major source of new business. D&T made several public presentations at the meetings, toting D&T's ongoing relationship with EPS while failing to disclose the origin of ICRS and NBC, and Massey's and Watts's self dealing relating to the sale of these two companies.

During the course of these meetings, defendants held secret financial briefings in which they acknowledged that EPS was over $10 million dollars below compliance with loan covenants and needed to raise $25 million to $50 million through syndications. Although EPS was in financial trouble and its existence was in doubt as of March 19, 1999, defendants failed to disclose this information to the Holdens and instead continued to represent a bright future for EPS, urging the Holdens to close the transaction.

Soon after EPS acquired Holden, EPS's financial troubles worsened, resulting in approximately $95 million in loses in 1999. Holden Corp. was ultimately drained of its revenues to partially meet those loses. Defendants, however, continued to conceal the true state of EPS's finances and continued to represent EPS's future as bright.

Despite rosy reports published in business journals and newsletters, EPS terminated Massey and Watts on November 24, 1999, and divested itself of National Health Care Recovery Services ("NHRS"), a business entity owned by Massey and Watts for which EPS paid $8 million but in fact had little value. NHRS had cost EPS an average of over $1 million per month until it was divested.

To stave off financial ruin, EPS began to liquidate itself by selling off a significant number of bona fide operating companies. Because of the sell-off of those operating companies and the massive defaults on bank debt, all of which were caused by defendants' actions and failures, EPS ceased to be a viable entity, and the plaintiffs' subordinated notes and shares in EPS became valueless, leading to the instant lawsuits.

## **Discussion**

D&T and Jefferies have moved to dismiss or stay the proceedings and compel arbitration in both cases, based on arbitration clauses contained in the written contracts between EPS and plaintiffs. Massey and Watts have joined those motions. Each of the contracts in question (the March 1, 1999 stock purchase agreement between EPS and Holden Corp., and the November 19, 1998 asset purchase agreement between Profit Source Corp. and DHR International, Inc.) contains the following clause:

> 7.13 Arbitration
>
> (a)(1) Any controversy or claim arising out of or relating to this Agreement shall be solely and finally settled by arbitration administered by the American Arbitration Association (the "AAA") . . ..

The Federal Arbitration Act ("FAA") provides that an arbitration clause in a "contract evidencing a transaction involving commerce . . . shall be valid, irrevokable, and enforceable

save upon such grounds as exist in law or in equity for the revocation of any contract." 9 U.S.C. § 2. Any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration. Moses H. Cohen Memorial Hospital v. Mercury Construction Corp., 460 U.S. 1, 24-5 (1983). Thus, once it is clear that the parties have a contract that provides for arbitration of some issues between them, any doubts concerning the scope of the arbitration clause are resolved in favor of arbitration. Mille v. Flume, 139 F.3d 1130, 1136 (7th Cir. 1998).

The touchstone of a motion to compel arbitration is a valid arbitration agreement. Whisler v. H.J. Meyers & Co., Inc., 948 F. Supp. 798, 800 (N.D. Ill. 1996). In the instant case, there is no dispute that the agreement is valid and enforceable between the parties to the contracts. Nor is there any real dispute that the particular clauses in question are extremely broad and cover plaintiffs' claims. Kiefer Specialty Flooring, Inc. v. Tarkett, Inc., 174 F.3d 907, 909 (7th Cir. 1999). Plaintiffs allege a scheme by defendants to acquire and improperly exploit their assets, using the contracts as a principal instrument in the scheme. Thus, plaintiffs' fraud claims arise out of and relate to the contracts. See Messing v. Rosencrantz, 872 F. Supp. 539, 540-41 (N.D. Ill. 1995). But neither D&T nor Jefferies is a party to either contract, and plaintiffs argue that the proceedings should not be stayed because D&T and Jefferies are not being sued under the contracts but for independent acts of fraud. See Britton v. Co-Op Banking Grp., 4 F.3d 742 (9th Cir. 1993).[4]

---

[4]The parties dispute the import of the contracts' choice of law clauses, which provide that the contracts shall be governed by, and construed and enforced in accordance with California law. Plaintiffs argue that California law applies to the issue of whether non-parties can enforce the arbitration clauses, while defendants argue that Federal law decides the issue. The court agrees with defendants. State contract law governs questions regarding the formation and validity of the contracts generally, while federal substantive law governs questions of arbitrability under the FAA. Because the determination of whether defendants can enforce the arbitration

14

Britton, however, hurts rather than helps plaintiffs' cause. In Britton, the individual defendant had been acting as a director, agent and employee during the time the corporate employer was committing securities fraud relating to the sale of tax shelters. The defendant later purchased the company and committed his own acts of fraud trying to discourage lawsuits. The Ninth Circuit held that the defendant could not rely on an arbitration clause contained in the original sales agreement for the tax shelters, because the "sum and substance" of the allegations against him were that "he in some way attempted to defraud the investors into not pursuing their lawsuits against the persons who originally sold the securities under the contract. These acts are subsequent, independent acts of fraud unrelated to any provision or interpretation of the contract." Id. at 748.

In the instant case, the "sum and substance" of the allegations against D&T, Jefferies, Massey and Watts, are that they fraudulently induced plaintiffs to enter into the contracts containing the arbitration clauses. As such, unlike in Britton, plaintiffs' principal claims against these defendants are not based on subsequent independent acts of fraud, but rather pre-date and are directly related to and arise out of the contracts in question. Thus, under Britton, D&T and Jefferies have standing to compel arbitration.

The mere fact that D&T and Jefferies are not signatories to the agreements does not defeat their right to compel arbitration. There are various methods by which non-signatories may enforce arbitration clauses. As this court has held, an agreement containing an arbitration clause covers non-signatories under common-law contract and agency principles. Messing, 872 F.

---

clauses presents no issue of contract formation or validity, the federal substantive law of arbitrability governs. See Int. Paper Co. v. Schwabedissen Maschinen & Analgen GMBH, 206 F.3d 411, 417 n.4. (4th Cir. 2000).

Supp. at 541. A non-signatory may invoke the agreement when, "under agency or related principles, the relationship between the signatory and nonsignatory defendants is sufficiently close that only by permitting the nonsignatory to invoke arbitration may evisceration of the underlying arbitration agreement between the signatories be avoided." MS Dealer Serv. Corp. v. Franklin, 177 F.3d 942, 947 (11th Cir. 1999). Additionally, when the parties to the contract agree to confer certain benefits thereunder upon a third party, affording that third party rights of actions against them under the contract, the third party may invoke the arbitration clause. Id.

Finally, equitable estoppel allows a non-signatory to compel arbitration in two distinct circumstances. First, equitable estoppel applies when the signatory "must rely on the terms of the written agreement in asserting its claim" against a non-signatory. Id. Thus, "[w]hen each of a signatory's claim against a nonsignatory 'makes reference to' or 'presumes the existence of' the written agreement, the signatory's claims arise out of and relate directly to the written agreement and arbitration is appropriate." Id. Second, equitable estoppel also applies "when the signatory raises allegations of . . . substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract." Id.

All the exceptions listed above are applicable in one form or another to the instant case. Obviously, plaintiffs' claims all make reference to and presume the existence of the written agreements. Additionally, plaintiffs claim that all the defendants conspired to induce them to participate in the roll-up. Indeed, both complaints contain civil conspiracy counts. The claims thus raise allegations of substantially interdependent and concerted misconduct by both the signatory (EPS) and the non-signatories. Therefore, plaintiffs are equitably estopped from avoiding arbitration.

Moreover, the facts alleged in the complaints support a conclusion that D&T and/or Jefferies were acting as EPS's agent(s) at the time some or all of the alleged fraudulent misconduct occurred. The relationship between EPS and D&T and Jefferies was so obviously intertwined that only by allowing the non-signatories to invoke arbitration would evisceration of the agreements be avoided.

Finally, the Holden contract and the Hoffman closing memo, which was made part of the Hoffman contract, each contain a provision whereby the sellers acknowledge for the benefit of D&T, that D&T was not related to EPS and that EPS and the individuals related to EPS with whom the sellers have dealt, have acted and will act on behalf of EPS and not D&T. These provisions were intended to confer benefit on D&T, and under MS Dealer, 177 F.3d at 947, appear to give D&T and additional right to enforce the agreement.[5]

## Conclusion

For the reasons set forth above, the court concludes that D&T and Jefferies can enforce the arbitration clauses. Accordingly, under 9 U.S.C. § 3, D&T's and Jefferies' motions to stay and compel arbitration are granted. Because plaintiffs have raised no arguments specific to

---

[5]Plaintiffs argue that D & T cannot be a third party beneficiary because the contracts contain a line that provides that "[n]othing in this Agreement will confer upon any person or entity not a party to this Agreement, or the legal representatives of such person or entity, any rights or remedies of any nature or kind whatsoever under or by reason of this Agreement." As D & T notes, however, specific contractual provisions govern over general provisions. Brinderson-Newberg Joint Venture v. Pacific Erectors, Inc., 971 F.2d 272, 279 (9th Cir. 1991). Thus, the specific provisions in which plaintiffs acknowledge, "for the benefit of D & T" that the persons with whom they have dealt were not acting on behalf of D & T would control. Moreover, there is no explanation for the inclusion of the provisions except to confer an enforceable contractual right on D & T.

17

Massey and Watts aside from those raised against D&T, Massey's and Watts' motion to stay and compel arbitration is also granted.

**ENTER:** **June 1, 2001**

Robert W. Gettleman
United States District Judge