IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JAMES HOLDEN, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 00 C 7488 |
| | ) | |
| DELOITTE AND TOUCHE LLP, et al. | ) | Judge Mark Filip |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs, James Holden and Christine Holden (collectively, the "Holdens"), filed an

action in this Court against Deloitte & Touche LLP ("Deloitte"), Jefferies & Company

("Jefferies"), EPS Solutions Corp. ("EPS"), and others in November 2000. The case was

assigned to District Judge Robert W. Gettleman, and on June 1, 2001, Judge Gettleman issued a

memorandum opinion and order compelling arbitration of the Holdens' respective claims against

Deloitte and Jefferies. *See Hoffman v. Deloitte & Touche LLP*, 143 F. Supp. 2d 995 (N.D. Ill.

2001). Thereafter, in late 2001, the Holdens entered into an arbitration agreement (the

"Arbitration Agreement") with Deloitte, Jefferies, and certain other named defendants. This

Arbitration Agreement modified the procedures for the arbitration from those specified in the

Holden/EPS Stock Purchase Agreement—for example, it substantially expanded the scope of

discovery available for the parties, adopted extended time frames in which discovery could be

completed, and redesignated the manner by which the arbitrators were selected. The Arbitration

Panel thereafter held nineteen pre-hearing conferences, with written orders resulting from each,

between July 31, 2002 and June 8, 2004. (D.E. 98, Ex. 4 ("Award" or "Arbitration Award") at

2.) The parties conducted the arbitration in the Summer of 2004, and it involved some fourteen

days of hearings, at which the testimony of some thirty-plus witnesses and hundreds of exhibits were introduced. (Award at 2; D.E. 97 at 4.) On October 26, 2004, the Panel issued a ten-page single-spaced Award in which the three-member Panel unanimously rejected the Holdens' claims. (*See* Award.)

In January 2005, Deloitte filed a motion to confirm the Arbitration Award. (D.E. 97.) The Holdens also filed an objection to confirmation and motion to vacate the Award, as well as a motion to reconsider Judge Gettleman's arbitration order. (D.E. 89.) For the reasons stated below, the motion to reconsider Judge Gettleman's order and objection to confirmation of the Arbitration Award are respectfully rejected. The motion to confirm the Arbitration Award is granted.

## I.    Background

The Holdens filed an action in this district court against Deloitte, Jefferies, EPS, and others in November 2000. The complaint alleges a complex fraudulent scheme conducted by Deloitte, Jefferies, and other named defendants acting in concert with them, to form and operate EPS. The complaint alleges that Deloitte, together with the other defendants, amassed stock to cash-in once EPS instituted its initial public offering ("IPO"). To raise funds, Deloitte and others allegedly sought to attract successful businesses to provide cash to keep EPS afloat until they could cash-in on the IPO. Specifically, the complaint alleges that Deloitte, acting in concert with the other defendants, induced the Holdens to sell their company to EPS, pursuant to a stock purchase agreement (the "SPA"), by making false statements about EPS's financial future and publicizing the public offering, even though they knew that EPS was short $10 million in earnings before interest, taxes, depreciation and amortization ("EBITDA") and in need of cash.

2

After the suit was filed, Deloitte and Jefferies each moved to stay the action, or in the alternative, for dismissal, and to compel arbitration pursuant to § 7.13 of the Stock Purchase Agreement ("SPA") between EPS and the Holdens. Section 7.13 of the SPA provides in relevant part that:

> (a)(i) Any controversy or claim arising out of or relating to this Agreement shall be solely and finally settled by arbitration administrated by the American Arbitration Association (the "AAA") . . . .

(D.E. 95, Ex. 1 (SPA § 7.13) (the "Arbitration Clause").)

After extensive briefing from the parties with respect to the requested relief, on June 1, 2001, the Honorable Judge Robert W. Gettleman issued a memorandum opinion and order compelling arbitration of the Holdens' claims against Deloitte and Jefferies. *See Hoffman v. Deloitte & Touche LLP*, 143 F. Supp. 2d 995 (N.D. Ill. 2001) ("*Hoffman*" or the "Arbitration Order"). In the Arbitration Order, Judge Gettleman noted that Deloitte and Jefferies were not signatories to the Holden/EPS SPA, but acknowledged and followed a substantial body of federal precedent teaching that non-signatories to agreements that contain arbitration clauses may invoke those clauses as against signatories under certain circumstances. *See Hoffman*, 143 F. Supp. 2d at 1003-05 (discussing various federal circuit precedents). Judge Gettleman found that the essence of the allegations against Deloitte and Jefferies is that they fraudulently induced the Holdens to enter into the SPA. *See, e.g., id.* at 1004 (stating that the Holdens' "principal claims against these defendants . . . pre-date and are directly related to and arise out of the contracts in question. Thus, . . . [Deloitte] and Jefferies have standing to compel arbitration."). He found that the Holdens were properly required to arbitrate their claims on multiple, independent bases, including common law agency and related principles, equitable estoppel, and third-party

3

beneficiary law. *Hoffman*, 143 F. Supp. 2d at 1004-05.

Thereafter, on or about December 19, 2001, the Holdens entered into the Arbitration Agreement with Deloitte, Jefferies, and certain other named defendants. The Arbitration Agreement modifies the arbitration procedures set forth in § 7.13 of the SPA. For example, the agreement requires an arbitral panel consisting of three neutral arbitrators, rather than two party-selected arbitrators who thereafter would select the third member of the panel. (D.E. 98, Ex. 2 ¶ 4; *see also id.* ¶ 5 (specifying that the three neutral arbitrators shall each be "a practicing attorney or a retired or former judge with at least fifteen (15) years experience with and knowledge of securities law, complex business transactions, and mergers and acquisitions").) The Arbitration Agreement also substantially expanded the scope of discovery available to the parties and the time period in which the parties and their counsel could complete such discovery. (*Id.* ¶¶ 7-9, 15.)[1] The parties also waived the right to seek attorneys' fees based on any judgment, order, ruling, or award entered in the arbitration. (*Id.* ¶ 19.) The Arbitration Agreement also provides that, by "entering into this Agreement," the Holdens "do not waive any objections to the [Arbitration Order]." (*Id.* ¶ 2.)

On December 20, 2001, the Holdens filed an arbitration demand with the American

_____

[1]    The Holdens implicitly suggest that the Panel was dilatory in its handling of the arbitration. (*See* D.E. 98 ("Holden Mem.") at 1) ("Although the goal of arbitration is supposedly swift and inexpensive justice, this case took over three years to complete.").) Given that the Holdens expressly agreed to expand the scope of discovery and to extend various deadlines via the Arbitration Agreement that otherwise would have applied, this suggestion is made with some meaningful degree of ill-grace. Moreover, the Court notes that the Panel stated that the parties filed 65 briefs regarding some 20 discovery disputes, with "many [of the briefs] running 15 pages or more." (Award at 2.) Although the Award does not specify which party filed which briefs, there is no suggestion that the Holdens refrained from this process, nor any reasonable basis to think they did. Resolving such contentious disputes in a responsible manner takes time.

4

Arbitration Association. (D.E. 97, Ex. F.) There were nineteen pre-hearing conferences held, with written orders resulting from each, between July 31, 2002 and June 8, 2004. (Award at 2.) The panel of three neutral arbitrators (the "Panel") presided over an extensive evidentiary hearing with respect to the Holdens' claims, which took place over fourteen days from June 18, 2004 to August 2, 2004. (*Id.*) The parties introduced testimony from over thirty witnesses (whether live or by deposition) and they introduced several hundred exhibits. At the conclusion of the arbitration, each party submitted seventy pages of post-hearing briefs and response briefs, and the parties orally argued their respective positions to the Panel. (*Id.*) Ultimately, on October 26, 2004, the Panel issued a ten-page statement of Awards and Reasons, in which the Panel unanimously ruled that, because the Holdens failed to prove an essential element of loss causation, Deloitte was not liable with respect to any of the Holdens' claims. (*See* Award.)

Several months prior to issuing the Arbitration Award with respect to Deloitte, the same Panel dismissed Jefferies from the arbitration proceedings as a result of a settlement reached between the Holdens and Jefferies. The Holdens and Jefferies sought the assistance of the Panel and the district court in effectuating that settlement. (D.E. 97, Ex. A.)

The case is currently before this Court on Deloitte's motion to confirm the Arbitration Award. The Holdens have filed an objection to confirmation of the Arbitration Award, a motion to vacate the Arbitration Award, and a motion to reconsider Judge Gettleman's Arbitration Order and to set the case for a jury trial. As explained below, the reconsideration motion concerning the Arbitration Order and motion to vacate the Arbitration Award are denied, and the motion to confirm the Award is granted.

5

## II.     Reconsideration of the Arbitration Order

### A.     Standard of Review

The Court first addresses the Holdens' motion to reconsider Judge Gettleman's June 2001 order finding that arbitration was appropriate (also, "Reconsideration Motion"). The Reconsideration Motion implicates two lines of teaching regarding the applicable standard of review by this Court.

First, under any circumstances, the appropriate scope for a reconsideration motion is a limited one. Precedent instructs that a motion to reconsider is appropriate only when the court has "patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension. A further basis for a motion to reconsider would be a controlling or significant change in the law or facts since the submission of the issue to the Court." *Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir. 1990) (internal quotation marks and citation omitted). As the Seventh Circuit has counseled, "[s]uch problems rarely arise and the motion to reconsider should be equally rare." *Id.* at 1191 (7th Cir. 1990) (internal quotation marks and citation omitted). A reconsideration motion should not be used to reargue or rehash arguments previously presented. *See Oto v. Metro. Life Ins. Co.*, 224 F.3d 601, 606 (7th Cir. 2000) ("[The] motions for reconsideration did little more than rehash old arguments. Rule 59 is not a vehicle for rearguing previously rejected motions and, as that is what Beverley attempted to do, we affirm the District Court's denial of those motions."); *accord, e.g., Neal v. Newspaper Holdings, Inc.*, 349 F.3d 363, 368 (7th Cir. 2003). Nor are reconsideration motions properly used to advance new arguments that could have been made before so as to attempt to avoid a waiver-bar

6

on appeal. *See, e.g., Caisse Nationale De Credit Agricole v. CBI Indus., Inc.*, 90 F.3d 1264, 1270 (7th Cir. 1996) ("Reconsideration is not an appropriate forum for . . . arguing matters that could have been heard during the pendency of the previous motion.") (collecting cases); *Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 n.4 (7th Cir. 1994) ("[R]aising this argument for the first time in the motion for reconsideration is not adequate to preserve the issue for appeal and definitely waives it.") (citing *Publishers Resource Inc. v. Walker-Davis Publications, Inc.*, 762 F.2d 557, 561 (7th Cir. 1985)). In short, such motions serve a "limited function: to correct manifest errors of law or fact or to present newly discovered evidence." *Caisse Nationale*, 90 F.3d at 1269 (internal quotation marks and citations omitted).

In addition, because of the particular procedural history of this case, which involves a transfer between district courts, a second line of authority is relevant and bears on the standard of review. Specifically, this case was originally before Judge Gettleman, and it came to this Court, along with a series of related cases, via reassignment in 2004 after this Court took the bench. Under such circumstances, the Holdens' Reconsideration Motion implicates a "variant of the law of the case doctrine that relates to the re-examination of a prior ruling by a different member of the same court . . . ." *Best v. Shell Oil Co.*, 107 F.3d 544, 546 (7th Cir. 1997). The Seventh Circuit has instructed that "the presumption [in such cases] is that the earlier rulings will stand" and that prior rulings should be disturbed only "for compelling reasons (such as new controlling law or clear error)." *Id.*; *accord, e.g., Fujisawa Pharm. Co., Ltd. v. Kapoor*, 115 F.3d 1332, 1339 (7th Cir. 1997) (the "second judge in a case in which there has been a reassignment [is] to abide by the rulings of the first judge unless some new development, such as a new appellate decision, convinces him that his predecessor's ruling was incorrect"). The "doctrine in these

7

circumstances reflects the rightful expectation of litigants that a change of judges mid-way through a case will not mean going back to square one." *Best*, 107 F.3d at 546.

With the Seventh Circuit's teachings in mind, the Court turns to the Holdens' Reconsideration Motion. For the reasons stated, that motion is respectfully denied.

B.    Analysis[2]

The issue before Judge Gettleman was whether the fact that Deloitte is not a signatory to the SPA defeats its right to compel arbitration pursuant to the SPA's Arbitration Clause. Because precedent teaches that analysis of such questions obviously depends on the specific facts presented by a case, the Court first describes the allegations of the Holdens. *Accord Grigson v. Creative Artists Agency, L.L.C.*, 210 F.3d 524, 527 (5th Cir. 2000); *MS Dealer Serv. Corp v. Franklin*, 177 F.3d 942, 947-48 (11th Cir. 1999) (citations omitted).

---

[2]    Deloitte contends that, because the Holdens enlisted the assistance of the arbitration Panel in effectuating the settlement with Jefferies & Company, Inc. (which Judge Gettleman also ordered to arbitration in the same opinion and on the same bases as he ordered Deloitte and the Holdens to arbitration), the Holdens should be judicially estopped from challenging the authority of the Panel to arbitrate their claims pursuant to the Arbitration Order. More specifically, according to Deloitte, after the Holdens settled their claims against Jefferies, they represented to the Panel that "a condition precedent to the effectiveness of that agreement is this Panel's issuance and the District Court's confirmation of a Bar Order under the Private Securities Litigation Reform Act ('PSLRA')." (D.E. 97 at 5.) According to Deloitte, the Panel in response issued an award containing the requested bar order, and the Holdens and Jefferies then jointly moved this district court for confirmation of that award, which motion was granted. (*See id.*) Deloitte contends that because the Holdens "previously represented in this Court that the Panel had authority to enter binding awards and sought and obtained confirmation of such an award, the Holdens are judicially estopped from denying that the very same Panel lacked jurisdiction to hear their claims against Deloitte." (*Id.* (citing *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001), regarding judicial estoppel).) Because the Court finds no basis to disturb Judge Gettleman's order sending these parties to arbitration under applicable law, this Court need not resolve Deloitte's judicial estoppel argument. Similarly, Deloitte also argues that the Holdens waived any challenge to the arbitrability of their claims against Deloitte "by failing to raise the issue of arbitrability with the Panel itself." (D.E. 97 at 6.) Again, given this Court's other rulings, it need not pass on this argument.

### 1. The Alleged Scheme and Conspiracy

The operative complaint at the time the arbitration issue was briefed before Judge Gettleman alleged a "complex fraudulent scheme conducted by [Deloitte] and Jefferies, and others acting in concert with them, to form and operate EPS . . . ." *Hoffman*, 143 F. Supp. 2d at 997.[3] In that complaint, in summary, the Holdens alleged that Deloitte, along with Jefferies and others, engaged in a conspiracy, and a "scheme or artifice to defraud" in violation of the civil RICO statute, and "used EPS to fraudulently induce the Holdens and other business owners to sell their companies to EPS," as the Holdens did in the SPA. (D.E. 1 at 2; *see also, e.g., id.* ¶¶ 89, 114-16.) The Holdens also alleged that the Defendants, including EPS, Deloitte, Jefferies, and others, endeavored together to commit a federal racketeering offense, the predicate offenses of which included acts of criminal fraud, including the preparation of financial information and statements that were attachments to the SPA. (*E.g., id.* ¶¶ 69-71, 89-90.)

More specifically, the complaint alleged that the coconspirators included Deloitte, Jefferies, EPS, and Christopher Massey—who was alleged to variously be a "senior partner" at Deloitte, as well as "CEO of EPS," and, in fact, was alleged to hold both posts at the same time for a substantial period of the operative events. (*E.g., id.* ¶ 7.) The defendants, including

---

[3]     It appears the Plaintiffs filed an amended complaint after the completion of the briefing on the arbitration motions. (D.E. 56.) Judge Gettleman's opinion does not make anything of the amendment, and it does not appear that the parties did either. Accordingly, the Court will take references from the operative complaint at the time that the issues were briefed to Judge Gettleman. *See generally Weinstein v. Schwartz*, ___ F.3d ___, 2005 WL 2100437, at *2 n.1 (7th Cir. Sept. 1, 2005) (collecting cases and teaching that a litigant's failure to raise or meaningfully develop an argument or issue waives it); *Jenniengs v. AC Hydraulic A/S*, 383 F.3d 546, 551 (7th Cir. 2004) ("Judges are not like pigs, hunting for truffles buried in briefs" or the record) (collecting cases; internal quotation marks and citation omitted); *see also* D.E. 53 (Holdens' motion to belatedly file an amended complaint, which motion reflects no indication that the belated filing should affect the fully briefed motions to compel arbitration).

Deloitte, were alleged to have directed and controlled EPS (*see id.* ¶ 96 (alleging that Deloitte,

Massey and the other defendants "conducted the business of EPS"), and the complaint further

alleged that "each of the defendants . . . drafted, reviewed, ratified, and/or approved the

misleading statements, releases, and reports of and about EPS and its component parts" that the

Holdens alleged were fraudulent. (*Id.* ¶ 100.)[4] These allegedly false statements included, *inter

alia*, information that was attached as Schedule 3.6 and Exhibit B to the SPA. (*See, e.g., id.* ¶ 69

(alleging that Deloitte and Massey "caused EPS to [falsely] represent to the Holdens in writing"

certain financial information that was incorporated and contained in Schedule 3.6 of the SPA);

*id.* ¶ 70 (similar); *id.* ¶ 71 (discussing allegedly false financial statements by Deloitte, Massey,

and others made orally and in documents that were, *inter alia*, incorporated as Schedule 3.6 of

the SPA (Ex. H to the complaint), and Exhibit B to the SPA (Ex. J to the complaint)).)[5] In this

---

[4]    *See also, e.g., id.* ¶ 53 (alleging that misrepresentations of, *inter alia*, Deloitte, induced the Holdens to enter into letter of intent culminating in the SPA); *id.* ¶ 56 (discussing Deloitte's endorsing of alleged misrepresentations made by CEO of EPS at January 1999 meeting); *id.* ¶ 59 (alleging that the misrepresentations at the January 1999 meeting "were instrumental in convincing the Holdens that selling their companies to the roll-up was a good idea"); *id.* ¶ 61 (alleging that "[o]n numerous other occasions, commencing in mid-December of 1998 through March of 1999," Deloitte, Massey (the CEO of EPS) and others made fraudulent misrepresentations to the Holdens); *id.* (discussing allegedly false "written representation, originally composed by [Deloitte] accountants and then maintained and refined by the CEO of EPS [Massey] and his staff"); *id.* ¶ 62 (alleging that "[s]ubstantially the same data was also in the documentation for the Holdens' March 19, 1999 closing of their sale of all their shares in Holden Corp" to EPS as effected by the SPA).

[5]    *See also id.* ¶ 73 (alleging that "in March of 1999, Massey [the CEO of EPS], with the cooperation of [Deloitte], continued to conceal from the Holdens relevant and key facts"); *id.* ¶ 76 (alleging that Deloitte, Jefferies, Massey, and others "induced EPS to falsely represent" certain financial information about EPS); *id.* ¶ 77 (alleging that Deloitte, Jefferies, Massey and others fraudulently induced the Holdens to rely on Deloitte and Jefferies to conduct due diligence concerning, *inter alia*, information reflected in Schedule 3.6 of the SPA).

regard, the complaint specifically identifies, as racketeering predicate acts of alleged criminal fraud, the communication to the Holdens of documents which included, Schedule 3.6 to the SPA (Ex. H to the complaint) and Exhibit B to the Stock Purchase Agreement (Ex. J to the complaint).[6]

The complaint alleges that "[Deloitte] and each of the defendants conspired with each other," and identifies the goal of the conspiracy as, *inter alia*, inducing sellers like the Holdens to "sell their companies" to EPS, as was done for the Holdens via the SPA. (*Id.* ¶ 114; *see also id.* ¶ 90 ("Each of the predicate acts had the same purpose, to induce the business owners to sell their businesses to EPS; [and] the same participants, defendants herein").)[7] The complaint sought over $110,000,000 for the Holdens, based in substantial part on the negotiated price and value purportedly reflected in the SPA. (*See, e.g., id.* ¶¶ 80, 88 (claiming damages "to the Holdens of

---

.

[6]     *See also, e.g., id.* ¶ 89 ("[e]ach such fraudulent communication constituted a predicate act of racketeering as set forth in the Racketeer Influenced and Corrupt Organization Act (18 U.S.C. § 1962(c))."); *id.* ¶ 108 (fraud count alleging that "[t]he statements made by or on behalf of [Deloitte], Massey [a Deloitte senior partner and/or CEO of EPS], and each of the other defendants [which included EPS], as set forth in the foregoing allegations and in the Exhibits to this complaint, were false and known to be false by those who made them").

[7]     *See also id.* ¶ 75 (alleging that from "December 1998 through March 1999, the Holdens were urged by or on behalf of [Deloitte], Jefferies, Massey," and others to close their sale of their shares via the SPA on March 19, 1999); *id.* ¶ 79 (alleging that in March 1999, Deloitte, Jefferies, Massey, and others "failed to disclose" various negative information about EPS "and instead continued to give them a rosy picture of the future and urged them to close the transaction [via the SPA] on March 19, 1999"); *id.* ¶ 80 (alleging that, because of their fraudulent activities, Deloitte, Jefferies, Massey, EPS, and others induced the Holdens to sell their interests in Holden Corp. via the SPA); *id.* ¶ 102 (alleging that "Defendants, individually and in concert, directly and indirectly, engaged in and employed acts and a fraudulent scheme . . .").

11

$110,000,000 " based on, *inter alia*, "the EPS price of over $100 million" in the SPA).)[8] In fact,

the Holdens sought to treble that figure pursuant to the RICO count, and claimed in excess of

$300,000,000 on such basis. (*See id.* ¶ 97(a) (seeking treble damages in excess of $300,000,000,

based on figures allegedly reflected in the SPA).)

      2.    Legal Analysis

            a.    The Holdens Do Not Make A Serious Claim That Reconsideration
                Relief Is Appropriate Under Applicable Standards

      The Holdens' Reconsideration Motion is denied for the threshold reason that they do not

make a serious challenge that reversal is warranted under the demanding standards applicable to

such motions, particularly in instances where the case has been transferred to a new district judge

after the ruling in question was issued. The Holdens do not claim that Judge Gettleman patently

misunderstood them, or has made a decision outside the adversarial issues presented to the Court

by the parties in connection with the various arbitration motions at play, or made an error not of

reasoning but of apprehension. Furthermore, although the Holdens make some attempt to argue

that decisions which were issued since Judge Gettleman's ruling demonstrate the manifest nature

of his error, the Holdens' arguments, fairly construed, are that Judge Gettleman was wrong based

---

[8]      *See, e.g., id.* ¶ 103 (alleging that "[n]o later than in the summer of 1998, beginning
and continuing through March 19, 1999 and thereafter, the defendants named herein . . . made a
series of false and misleading statements and omissions, all of which caused the Holdens to pay
for EPS stock [at] an artificially inflated price" via the SPA); *id.* ¶ 105 (alleging that "[t]he
Holdens have suffered substantial damages in that, in reliance on false and fraudulent statements,
they sold their companies [via the SPA] in exchange for shares of EPS stock . . . . The Holdens
would not have purchased EPS stock at the effective prices he [sic] paid by exchanging it for
their shares and interests in their companies, or at all, if they had been aware that the statements
on which they were relying were false and misleading and that other relevant facts had been
concealed"); *see also, e.g.,* ¶ 88 (seeking damages in excess of $100,000,000); ¶¶ 106, 113, 116,
121 (all same).

on long-settled law, which is overwhelmingly the authority that the Holdens cite. (*See, e.g.*, Holden Mem. at 3 ("This was error because the Supreme Court has taught for years that . . . . "); D.E. 101 ("Holden Reply") at 3 (citing, *inter alia, Chiarella v. United States*, 445 U.S. 222 (1980), and *Gratz v. Claughton*, 187 F.2d 46 (2d Cir. 1951)). Because the heart of the Holdens' arguments do not qualify under applicable standards for reconsideration motions, or for motions governing review by one district judge of another's prior ruling, the Reconsideration Motion is respectfully denied on that basis.

> b. Judge Gettleman's Ruling Appears Correct In Any Event

In addition, this Court declines to overturn Judge Gettleman's Arbitration Order because it appears to be correct. As explained, Judge Gettleman ruled that the Holdens were required to arbitrate their claims on multiple, independent bases, including common law agency and related principles, equitable estoppel, and third-party beneficiary law. *Hoffman*, 143 F. Supp. 2d at 1004-05. These bases, and the first two, in particular, as they are most clearly correct in this Court's view, are discussed below.

> i. General Principles

As an initial matter, the parties disputed the relevance of the SPA's choice of law clause, which provides that the agreement shall be governed by California law. (SPA at § 7.4.) The Holdens argued that California law should apply to the issue of whether non-parties can enforce the SPA's Arbitration Clause, whereas Deloitte argued for application of federal law. Ultimately, Judge Gettleman concluded that state law was not relevant because there is no dispute regarding contract formation, validity, or interpretation, and federal substantive law governs the question of arbitrability. *Hoffman*, 143 F. Supp. 2d at 1004 n.4. In reaching this result, Judge Gettleman

followed federal appellate authority—*see Int'l Paper Co. v. Schwabedissen Maschinen &*
*Anlagen GMBH*, 206 F.3d 411, 417 n.4 (4th Cir. 2000) ("Because the determination of whether
International Paper, a nonsignatory, is bound by the Wood-Schwabedissen contract presents no
state law question of contract formation or validity, we look to the 'federal substantive law of
arbitrability' to resolve this question") (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr.*
*Co.*, 460 U.S. 1, 24 (1983))—a course followed by other federal courts. *See, e.g., Fujian Pacific*
*Elec. Co. Ltd. v. Bechtel Power Corp.*, No. C 04-3126 MHP, 2004 WL 2645974, at *3 (N.D. Cal.
Nov. 19, 2004).

The Holdens argue, with considerable ardor, that Judge Gettleman erred because he
should have looked to California law to determine this question. While the Holdens cite many
California decisions about various legal principles, their research apparently did not uncover
California appellate authority which expressly agreed with Judge Gettleman's analysis on this
matter and rendered a decision on that basis. *See Metalclad Corp. v. Ventana Envtl. Org. P'Ship*,
109 Cal. App. 4th 1705, 1712-13 (Cal. App. Ct. 2003) ("Whether [defendant] Ventana, a
nonsignatory to that agreement, may rely on it to compel [signatory/plaintiff] Metalclad to
arbitration is answered by federal law, not state law") (citing and quoting *Schwabedissen*, 206
F.3d at 417 n.4). *Metalclad* proceeded to note the "wide acceptance" in the federal courts of the
teachings of cases such as *MS Dealer Service Corp. v. Franklin*, 177 F.3d 942 (11th Cir. 1999),
the case that Judge Gettleman principally relied on in ordering Deloitte and the Holdens to
arbitration on various independent grounds. *See Metalclad*, 109 Cal. App. 4th at 1714 (collecting
numerous federal appellate authorities). *Metalclad* stated that it agreed with the federal courts'
teachings embodied in cases such as *MS Dealer*. *See id.*, 109 Cal. App. 4th at 1716 ("The 11th

14

Circuit's decisions in *Sunkist and MS Dealer* persuade us equitable estoppel should be applied here."). *Metalclad* proceeded to explain why signatory-plaintiff Metalclad was required to arbitrate its claims against non-signatory defendant Ventana Environmental Organizational Partnership, and explained that such estoppel was appropriate because, *inter alia*,

> Metalclad agreed to arbitration in the underlying written contract but now, in effect, seeks the benefit of that contract in the form of damages from Ventana while avoiding its arbitration provision. Estoppel prevents this.

*Id.*, 109 Cal. App. 4th at 1717. *Metalclad* also rejected the contention that arbitration was not required because the signatory-plaintiff cast its claims in tort rather than in terms of breach of contract. *See id.* at 1717-18 ("it is well established that a party may not avoid broad language in an arbitration clause by attempting to cast its complaint in tort rather than contract") (internal quotation marks and citation omitted).

The Court will discuss later why, in its view at least, Judge Gettleman did not err in finding that the Holdens were required to arbitrate their claims. For present purposes, however, the salient point is that the Holdens' repeated contention that Judge Gettleman erred by applying "federal cases under the FAA instead of state law to the question whether nonsignatory Deloitte could invoke the arbitration clause of the SPA" (Holden Mem. at 3) fails to acknowledge that California authority agrees with Judge Gettleman on this point. This agreement in California authority renders much of the Holdens' extended discussions of other areas of California law effectively, with all respect, of limited, if any, relevance.

The Holdens also argue that the Supreme Court's decision in *EEOC v. Waffle House*, 534 U.S. 279 (2002), revealed the patent error of Judge Gettleman's ruling, although they certainly did not make any argument to that effect in the years after *Waffle House* was decided and the case

was still with Judge Gettleman. In any event, the Holdens' citation of *Waffle House* does not convince this Court that Judge Gettleman erred. *Waffle House* dealt with the question of whether the EEOC could be barred as a government regulator from electing to pursue victim-specific relief on behalf of an employee who had agreed to arbitrate claims with an employer, where the EEOC had never entered into such an agreement. *See id.*, 534 U.S. at 282. The decision substantially turned on a careful review of "the provisions of Title VII defining the EEOC's authority . . . ." *Id.* at 285-86; *accord, e.g., id.* at 296 ("To hold otherwise would undermine the detailed enforcement scheme created by Congress [for the EEOC] . . . ."); *id.* at 297 (the Federal Arbitration Act does not authorize the courts "to second-guess the agency's [EEOC's] judgment concerning which of the remedies authorized by law that it shall seek in any given case"); *id.* at 291 (stating that "[i]f it were true that the EEOC could prosecute its claim only with Baker's [the employee's] consent, or if its prayer for relief could be dictated by Baker," the result might be different). The decision—which held that the non-signatory EEOC could not be bound in its enforcement authority—did not address nor purport to speak to the *MS Dealer* line of cases, and the carefully calibrated language of the decision does not suggest that it implicitly displaced or rejected that widely accepted line of appellate authority. *See, e.g., id.* at 297 ("The only issue before this Court is whether the fact that Baker has signed a mandatory arbitration agreement limits the remedies available to the EEOC"); *accord, e.g., In the Matter of Volpert*, 110 F.3d 494, 497 (7th Cir. 1997) (discussing the well-settled principle that "'[q]uestions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents'") (quoting *Webster v. Fall*, 266 U.S. 507, 511 (1925)).

16

Moreover, and independently, *Waffle House* dealt with a materially different factual scenario than the one presented here. *Waffle House* involved an attempt by a signatory defendant that was attempting to compel a plaintiff (and government regulator, the EEOC) to arbitration based on a contract that the regulator/plaintiff had never signed. This case, by way of contrast, deals with a non-signatory defendant seeking to compel a signatory plaintiff to arbitration. In addition, the allegations in this case contend: that Deloitte is part of an extensive conspiracy and racketeering scheme with the signatory defendant EPS (and therefore is putatively accountable to the Holdens on such basis for the acts of EPS); that various allegedly fraudulent statements were conveyed and contained in attachments to the SPA; and that the Holdens are entitled to hundreds of millions of dollars in damages based on the valuation numbers purportedly reflected in the SPA.

Federal courts have noted the distinction between this setting—*i.e.*, where the non-signatory defendant is seeking to compel a signatory plaintiff to arbitration—and the one presented in *Waffle House*, and distinguished the case on that basis. For example, the First Circuit recently cited *Waffle House* for the general rule that "a contract cannot bind a non party" but stated there are exceptions to the rule, such as the estoppel theory that Judge Gettleman applied. *Medical Air Tech. Corp. v. Marwan Inv., Inc.,* 303 F.3d 11, 18 (1st Cir. 2002) (citing *Grigson,* 210 F.3d at 527-31; *MS Dealer,* 177 F.3d at 947-48, and *Hughes Masonry Co., Inc, v. Greater Clark County Sch. Bldg. Corp.*, 659 F.2d 836, 841 & n.9 (7th Cir. 1981)). In another case, a district court distinguished *Waffle House* as addressing only situations in which non-signatories are compelled to arbitrate and not cases where, as here, the non-signatory seeks to compel a signatory party to arbitrate. *See Gambardella v. Pentec, Inc.*, 218 F. Supp. 2d 237,

17

242 (D. Conn. 2002). The *Gambardella* court cited *Choctaw Generation Limited Partnership. v.*

*American Home Assurance Co.*, 271 F.3d 403, 406 (2d Cir. 2001), as noting the distinction

between these situations and concluded that *Waffle House* "does not alter this analysis." *Id.* at

242 ("[T]he issue here is not whether non-signatories to the agreement can be compelled to

arbitrate; rather, it is whether these non-signatories may compel plaintiff, admittedly a party to

the contract, to arbitrate").[9]

This Court sees no basis to read *Waffle House* as displacing the long line of authority

concerning third-party enforcement of arbitration clauses against signatories that is reflected in

---

[9]     Other federal courts have observed the different outcomes in cases where the non-signatory, rather than the signatory, seeks to compel arbitration. For example, the Fifth Circuit distinguished the cases compelling signatories such as the Holdens to arbitrate where those parties had agreed to arbitrate claims of the type that they assert against the non-signatory. *Bridas S.A.P.I.C. v. Government of Turkmenistan*, 345 F.3d 347, 361 (5th Cir. 2003) (collecting cases). The Fifth Circuit reasoned that "[i]t is more foreseeable, and thus more reasonable, that a party who has actually agreed in writing to arbitrate claims with someone might be compelled to broaden the scope of his agreement to include others." *Id.* (internal quotation marks and citation omitted). The Holdens also cite *R.J. Griffin & Co. v. Beach Club II Homeowners Assocs.*, 384 F.3d 157 (4th Cir. 2004), but the factual setting of that case is distinguishable from this one. In *R.J. Griffin*, a homeowners' association became embroiled in a dispute with a contractor and sued in state court. *Id.* at 159. The contractor countersued in federal court and moved to compel the association to arbitrate the dispute pursuant to a construction contract to which the homeowners' association was not a party and under which it was not claiming any direct benefit. *Id.* Unlike the Holdens, the association in *R.J. Griffin* was not a signatory to the contract and never consented to the contract or the contract's arbitration clause; instead, the case involved a signatory (the contractor) seeking to compel a non-signatory (the homeowners' association) to arbitration. The Holdens' reliance on *Coots v. Wachovia Sec., Inc.,* 304 F. Supp. 2d 694, 701 (D. Md. 2003), *vacated and remanded by* 114 Fed. Appx. 586 (4th Cir. Dec. 10, 2004) (per curiam) (vacating for insufficient showing of the propriety of diversity jurisdiction), is also misplaced, to the extent the case is authoritative at all. First, *Coots* involved a signatory (rather than a non-signatory like Deloitte) trying to compel a non-signatory (rather than a signatory) to arbitrate. Moreover, the *Coots* court expressly declined to rule on the application of the estoppel doctrine because, unlike was alleged to be the case with Deloitte and EPS here, the interests of the two relevant parties stood in "marked opposition to each other" and thus could not be "intertwined." *Id.* at 700-01. The *Coots* plaintiffs also sought no benefit from the contract, whereas the Holdens seek to use the SPA as a central part of their claims and damages theories.

federal appellate cases such as *MS Dealer* (and upon which Gettleman principally relied) and the

California Court of Appeals' decision in *Metalclad*.[10]  Accordingly, the Court proceeds to

examine the various grounds on which Judge Gettleman concluded that the Holdens were

required to arbitrate their claims against Deloitte.

ii.     Equitable Estoppel

Judge Gettleman held that equitable estoppel principles directed that the Holdens fairly

were required to arbitrate their claims against Deloitte. *See Hoffman*, 143 F. Supp. 2d at 1004-

05.  Judge Gettleman held that equitable estoppel was appropriate because it applies where "the

signatory [here, the Holdens] 'must rely on the terms of the written agreement in asserting its

claim' against a non-signatory.  Thus, '[w]hen each of a signatory's claims against a

nonsignatory 'makes reference to' or 'presumes the existence of' the written agreement, the

signatory's claims arise out of and relate directly to the written agreement and arbitration is

appropriate.'" *Id.* at 1004-05 (quoting *MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942, 947

(11th Cir. 1999)); *accord, e.g., Grigson*, 210 F.3d at 527 (quoting *MS Dealer*, 177 F.3d at 947).

Judge Gettleman also held that equitable estoppel applied because the Holdens' case presented a

situation where "'the signatory [here, the Holdens] raises allegations of . . . substantially

interdependent and concerted misconduct by both the nonsignatory and one or more of the

---

[10]     In a sense, the Holdens at times appear to concede as much, for they state that
"[i]n certain limited circumstances, courts have permitted nonsignatories to a contract to compel
arbitration absent an agreement permitting them to do so." (Holden Mem. at 7.)  The Holdens
also concede that "[t]he FAA would apply, of course, to the question of whether the [SPA]
agreement, once construed under state law, could be extended to compel a non-signatory (like
Deloitte) to arbitrate.") (*Id.* at 4 n.2.)  The Holdens then proceed to argue, unpersuasively, why
Judge Gettleman clearly erred in concluding that arbitration was warranted. *See Hoffman*, 143 F.
Supp. 2d at 1004-05.

signatories to the contract.'" *Id.* (quoting *MS Dealer*, 177 F.3d at 947); *accord, e.g., Grigson*, 210 F.3d at 527 (quoting *MS Dealer*, 177 F.3d at 947).

As Judge Gettleman found, this case falls within each of these categories of equitable estoppel. *Hoffman,* 143 F. Supp. 2d at 1004-05. The Court will discuss the "concerted misconduct" ruling at greater length below, in this Court's discussion of agency and conspiracy principles, as the discussion is equally if not more apt there than here. *See, e.g., United States v. Lindemann,* 85 F.3d 1232, 1238 (7th Cir. 1996) (discussing the "basic agency principle that acts by one conspirator are chargeable against all those who conspired"). Suffice to say for present purposes that there is no question that the Holdens alleged "concerted misconduct" by Deloitte and the other defendants. *MS Dealer*, 177 F.3d at 947. The complaint charged that "[Deloitte] and each of the defendants conspired with each other," and identified the goal of the conspiracy as inducing parties like the Holdens to "sell their companies" to EPS, as was done for the Holdens through the SPA. (D.E. 1 ¶ 114; *see also id.* ¶ 90 ("Each of the predicate acts had the same purpose, to induce the business owners to sell their businesses to EPS; [and] the same participants, defendants herein").) The Holdens also charged that Deloitte and others, including EPS, schemed together to commit a federal racketeering offense, with the Holdens specifically identifying as predicate offenses the preparation of financial statements that were attached to and were part of the SPA. (*E.g., id.* ¶¶ 69-71, 89-90.) In raising such allegations, the Holdens cannot "have it both ways" and advance claims alleging concerted misconduct with signatory defendants while simultaneously seeking to ignore an arbitration agreement that they have made with the signatory. *See, e.g., Grigson,* 210 F.3d at 528 (citing *MS Dealer*, 177 F.3d at 947, and *Hughes*

*Masonry Co. v. Greater Clark County Sch. Bldg. Corp.*, 659 F.2d 836, 838-39 (7th Cir. 1981)).[11]

In addition, the Court agrees with Judge Gettleman that the Holdens' claims "all make reference to and presume the existence of the written agreemen[t]" that contains the arbitration clause. *Hoffman*, 143 F. Supp. 2d at 1005 (citing *MS Dealer*). In this regard, the Court notes that, as the Holdens point out, some federal authorities have cautioned against requiring arbitration simply because a signatory's claims make some indirect or non-essential reference to the contract with the arbitration clause. *See R.J. Griffin & Co.*, 384 F.3d at 161 ("Our job here is to determine whether the Association is seeking a *direct benefit* from the general construction contract between Drake and Griffin.") (emphasis added). But one need not reach out into the periphery of the possible applications or readings of *MS Dealer* to conclude that Judge Gettleman got this particular result correct. The Holdens' claims are fundamentally related to the SPA that contained the arbitration agreement. In fact, some of the specific acts of alleged fraud (highlighted as alleged racketeering predicates) are false statements that are contained in documents that were attached to and are part of the SPA. (*See, e.g.*, D.E. 1 ¶¶ 69-71.) In

---

[11]    Although the Court has not attempted to carefully review the Holdens' amended complaint, which was filed after the arbitration motions were fully briefed, the Court notes that the amended complaint does not appear, for example, to contain a RICO count. (D.E. 56.) The Court does not view that issue as material for multiple reasons. First, one cannot fairly second-guess Judge Gettleman for ruling on the basis of the complaint that was on file at the time the arbitration motions were filed and fully briefed, and on which they are predicted—particularly where none of the parties appears to have suggested that the amended complaint materially changed anything. In addition, and independently, the Court notes that the amended complaint still contained a conspiracy count, which alleged the complicated fraud scheme, and it identified as material fraudulent statements information contained in Section 3.6 of the SPA, which was attached to the amended complaint as an exhibit. The Holdens also sought in that amended complaint to obtain damages based on the prices and financial figures allegedly reflected in the SPA, as the Holdens did at the end of the arbitration. *See* Claimants' Post-Hearing Memorandum at 41, discussed further, *infra*.

21

addition, the Holdens allege that a central goal of the conspiracy and claimed fraud scheme was to induce individuals like the Holdens to "sell their companies" to EPS, as the Holdens did through the SPA. (*Id.* ¶ 114; *see also id.* ¶ 90 ("Each of the predicate acts had the same purpose, to induce the business owners to sell their businesses to EPS; [and] the same participants, defendants herein").) And the Holdens' case sought to hold the Defendants' liable for the consideration the Holdens believed they should have gained through and under the SPA, or some $100,000,000. (*See, e.g., id.* ¶¶ 80, 88.)[12] In this regard, the Holdens, in their principal post-arbitration brief, sought damages under what they described as "[t]he benefit-of-the-bargain' model." Claimants' Post-Hearing Memorandum at 41. According to the Holdens, "the benefit of the bargain theory **enforces** the transaction and compels the defendant to give what was bargained for, or its value." *Id.* (emphasis in original).[13]

Under such circumstances, the Holdens are certainly not seeking some indirect benefit from, or making some indirect reference to, the SPA. Nor need arbitration be ordered simply because their claims contemplate that another contractual relationship might coincide with Deloitte's alleged wrongs. Instead, a central goal of the alleged conspiracy and scheme was the effectuation of the SPA, in which multiple alleged fraudulent statements were made for which Deloitte is allegedly responsible, and by which the fraud was actually completed. In this case, the claims of the Holdens are intertwined with the SPA and the contents of it. Moreover, the

---

[12]     In fact, the Holdens sought to treble that number through the RICO count. (*See id.* ¶ 97(a).)

[13]     *See also id.* ("In this case, the Holdens bargained to exchange their company for a value in excess of its so-called fair market value. [. . . .] That was what was bargained for and that is what the Holdens are entitled to on the benefit of the bargain theory.").

22

Holdens seek to leverage the monetary terms of the SPA as the basis for their substantial damages claim. Under such circumstances, equitable estoppel, under considerable authority, is appropriate. *See, e.g., MS Dealer*, 177 F.3d at 947-48; *Grigson*, 210 F.3d at 527; *Hughes Masonry*, 659 F.2d at 838-39 & 841 n.9. Notably, the teachings of the California Court of Appeals also would support application of estoppel so as to require arbitration under such circumstances. *See Metalclad*, 109 Cal. App. 4th at 1717 ("Metalclad agreed to arbitration in the underlying written contract but now, in effect, seeks the benefit of that contract in the form of damages from Ventana [*i.e.*, the non-signatory] while avoiding its arbitration provision. Estoppel prevents this."); *see also Hughes Masonry*, 659 F.2d at 839 ("In short, [plaintiff] cannot have it both ways. [It] cannot rely on the contract when it works to its advantage, and repudiate it when it works to [its] disadvantage.") (internal citations omitted).

Like the *MS Dealer* court, the Court acknowledges that the Holdens cast their claims against Deloitte as tort claims rather than contract claims. "However, it is well established that a party may not avoid broad language in an arbitration clause by attempting to cast its complaint in tort rather than contract." 177 F.3d at 948 n.4 (citing *Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.*, 10 F.3d 753, 758 (11th Cir. 1993); *accord, e.g., Sweet Dreams Unlimited, Inc. v. Dial-A-Mattress Int'l, Ltd.*, 1 F.3d 639, 643 (7th Cir. 1993) (teaching that the Seventh Circuit has "routinely held that a party may not avoid a contractual arbitration clause merely by casting its complaint in tort") (collecting cases). The Holdens' claims are "intimately founded in and intertwined with the underlying contract obligations." *Hughes Masonry*, 659 F.2d at 841 n. 9. Under such circumstances, and for the reasons explained above, courts have widely found that equitable estoppel fairly requires the signatory to arbitrate its claims. Moreover, failure to

23

require arbitration would allow for arbitration agreements to be effectively eviscerated via conspiracy counts and allegations of concerted misconduct that in effect would put a signatory on trial, notwithstanding the agreement to arbitrate. *See, e.g., MS Dealer*, 177 F.3d at 947; *Hughes Masonry*, 659 F.2d at 841 n. 9.[14]

In light of the substantial authority supporting Deloitte's right to compel the Holdens to arbitrate their claims pursuant to the doctrine of equitable estoppel, the Court finds no basis to reconsider Judge Gettleman's Arbitration Order on this point.

        iii.    Agency Law and Related Principles

Judge Gettleman also found, independently, that the Holdens fairly were required to

---

[14]      The Holdens repeatedly point to the fact that the SPA contains a provision limiting the creation of third-party rights under it. The Holdens argue that because of this provision, equitable estoppel and agency principles cannot be used to require the Holdens to arbitrate their claims. The Holdens cite no authority adopting such an argument or even commenting on it favorably, and this Court does not find it persuasive. First, the absence of supportive authority is notable. These sorts of provisions are *de rigeur*, and one can reasonably assume that similar provisions existed in the series of cases establishing the equitable estoppel and agency bases for compelling arbitration. Second, and independently, agency concepts and coconspirator concepts teach that the alleged coconspirator (or coschemer, or agent) is effectively in the shoes of the signatory defendant and that the two parties are responsible for each other's misconduct. As a result, the idea that other third-parties might not otherwise acquire rights under contractual liability principles is, with all respect, beside the point. The non-signatory, by virtue of the plaintiffs' allegations, is standing in the shoes of the signatory. Third, and again independently, to the extent that application of equitable estoppel has to do with concepts of equity and fairness—and precedent would suggest that it has much to do with them, *see, e.g., Grigson v. Creative Artists Agency, L.L.C.*, 210 F.3d 524, 528 (5th Cir. 2000) ("The linchpin for equitable estoppel is equity—fairness"); *Hughes Masonry Co., Inc, v. Greater Clark County Sch. Bldg. Corp.*, 659 F.2d 836, 838-39 (7th Cir. 1981)—it would seem unjust to preclude a non-signatory who otherwise would fairly be entitled to compel arbitration of the signatory's claims from doing so simply because the signatory sought to freeze out the non-signatory's rights in a contract to which the non-signatory was not a named party. As explained, the Holdens provide no authority for their position, and it is respectfully rejected. The Court also notes that to the extent that Judge Gettleman correctly concluded that agency or third-party beneficiary concepts apply and warrant arbitration, the Holdens' "no third-party rights" argument would appear to be moot.

arbitrate their claims under agency and related principles. *See Hoffman*, 143 F. Supp. 2d at 1005. This ruling also appears to be correct.

Federal courts repeatedly have recognized that agency law and related principles can permit the enforcement of arbitration agreements by nonsignatories. *See Grigson*, 210 F.3d at 527 (arbitration clause can be enforced against signatory when complaint "'raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract'") (quoting *MS Dealer*, 177 F.3d at 947); *accord, e.g.*, *MS Dealer*, 177 F.3d at 947 ("[U]nder agency or related principles, the relationship between the signatory and non-signatory defendants is sufficiently close that only by permitting the non-signatory to invoke arbitration may evisceration of the underlying arbitration agreement between the signatories be avoided."); *Letizia v. Prudential Bache Sec., Inc.*, 802 F.2d 1185, 1187 (9th Cir. 1986); *In re Oil Spill by Amoco Cadiz*, 659 F.2d 789, 794-95 (7th Cir. 1981) (requiring non-signatory plaintiff to arbitrate claim); *Kahn v. Peak*, No. 91 C7148, 1992 WL 142297, at *3 (N.D. Ill. June 18, 1992) (Plunkett, J.) (plaintiff alleged that president was corporation's agent for purposes of liability; therefore he could not claim that non-signatory president was not corporation's agent so as to avoid arbitration of claim that misrepresentations in offering memorandum led plaintiff to enter into business agreement with the corporation that contained arbitration clause). In assessing whether the plaintiff is advancing allegations that implicate doctrines concerning agency and concerted misconduct, cases have looked to the allegations of the plaintiff's complaint—*see Grigson*, 210 F.3d at 527; *MS Dealer*, 177 F.3d at 947-48 (citations omitted)—and have not asked whether the non-signatory defendant concedes it is, for example, a coconspirator or agent of a putative malefactor.

The Holdens' complaint was replete with allegations of concerted misconduct by Deloitte

and the signatory EPS, as well as with allegations that Deloitte was acting on behalf of EPS.

*See, e.g.*, D.E. 1 ¶ 69 (alleging that Deloitte and Massey "caused EPS to [falsely] represent to the

Holdens in writing" certain fraudulent financial information that was embodied in, *inter alia*,

Schedule 3.6 of the SPA)*; id.* ¶ 70 (similar); *id.* ¶ 96 (alleging that Deloitte, Massey and the other

defendants "conducted the business of EPS"); *id.* ¶ 76 (alleging that Deloitte, Jefferies, Massey,

and others "induced EPS to falsely represent" certain financial information about EPS); *id.* ¶ 117

(alleging that Deloitte is liable for fiduciary breach "as both promoters of EPS and agents of the

prospective investors, including the Holdens"); *id.* ¶ 100 (alleging that "each of the defendants

. . . drafted, reviewed, ratified, and/or approved the misleading statements, releases, and reports

of and about EPS and its component parts"); *id.* ¶ 114 (alleging that "[Deloitte] and each of the

defendants conspired with each other" and identifying as the goal of the conspiracy as inducing

the Holdens, among others, to "sell their companies" to EPS, as the Holdens did by the SPA); *id.*

¶ 102 (alleging that "Defendants, individually and in concert, directly and indirectly, engaged in

and employed acts and a fraudulent scheme . . ."). Accordingly, Judge Gettleman concluded that

the facts alleged in the Holdens' complaint supported the conclusion that "[Deloitte] acted as

EPS's agent [] at the time some or all of the alleged fraudulent misconduct occurred" and that

"the relationship between EPS and [Deloitte] [] was so obviously intertwined that only by

allowing the non-signatories to invoke arbitration would evisceration of the agreements be

avoided." *Hoffman*, 143 F. Supp. 2d at 1004 (relying on *MS Dealer*).

The Holdens argument as to why Judge Gettleman purportedly erred in this aspect of his

order is, with all respect, not a substantial one. First, the Holdens argue that agency and

26

coordinated misconduct principles are not applicable because Deloitte does not concede that it is a coconspirator or agent of other alleged malefactors. As indicated, federal precedent has looked to the allegations in the plaintiff's complaint, and has not required the defendant to concede such a substantive issue to advance its arbitration arguments. The Holdens cite no federal authority in support of their position on this point, but instead cite two intermediate appellate decisions from Illinois. (*See* Holden Mem. at 8 (citing *Peach v. CIM Ins. Corp.*, 816 N.E.2d 668 (Ill. App. Ct. 2004); *Ervin v. Nokia, Inc.*, 812 N.E. 2d 534 (Ill. App. Ct. 2004).) The Holdens, however, contend that California law is relevant to the arbitration question, so the relevance of these citations, even on the Holdens' view of things, is not apparent. Moreover, those decisions reject application of the entire line of federal precedent embodied in cases like *MS Dealer* and *Grigson*—see, *e.g.*, *Ervin*, 812 N.E. 2d at 516—a position that is in conflict with those federal cases and the view of the courts of the State of California. *See, e.g.*, *Metalclad Corp.*, 109 Cal. App. 4th at 1712-14. As a result, these Illinois cases do not warrant a different result than the one reached by Judge Gettleman.[15]

In their reply brief regarding their reconsideration motion, the Holdens for the first time suggest that the agency/concerted misconduct basis for Judge Gettleman's ruling is infirm because it conflates the concept of an "agent" with that of a "promoter," who bears fiduciary duties because of the promoter's access to confidential information. (Holden Reply at 3.) This

---

[15]     The idea of assessing arbitrability based on the allegations in the complaint also makes substantial practical sense. Arbitrability issues must be sorted out sooner rather than later in a case, lest the party seeking to compel arbitration be seen to have waived the issue. As a result, the question of arbitrability would seem to be fairly addressed, at least typically (perhaps absent some claim of coercion or the like) on the basis of the plaintiff's allegations and the language of the operative arbitration clause, and not on the basis of issues that might not be resolved until after extensive discovery was completed.

27

suggestion is no basis to displace Judge Gettleman's ruling.

First, this argument appears for the first time in a reply brief—and to a reconsideration motion—notwithstanding that Judge Gettleman clearly ruled that arbitration was warranted on the basis of the agency/concerted misconduct allegations in his opinion. Making an argument for the first time in a reply brief, as a matter of process, is insufficient to present an argument in a trial court. *See FTC v. World Media Brokers*, 415 F.3d 758, 766 (7th Cir. 2005) (collecting cases).[16]

Second, the allegations in the complaint are not presented with any sense that the Holdens are defining Deloitte (or anyone else) as a "promoter"—with that term bearing a specific or unique legal meaning—and that the Holdens are thereby seeking to trigger some relatively arcane legal liability as compared to the liability imposed by ordinary agency and coconspirator principles. As mentioned, the complaint is replete with allegations of concerted misconduct (there is a specific conspiracy count), and the Defendants are repeatedly alleged to have schemed together to defraud the Holdens. The complaint also alleges, by way of example, that the EPS roll-up was being sponsored by Deloitte (D.E. 1 ¶ 24), and that Deloitte "caused EPS to [falsely] represent to the Holdens in writing" certain financial information about the company, including information reflected in attachments to the SPA. (*Id.* ¶ 69; *see also id.* ¶¶ 70-71). Whatever particular or additional duties may attend to a "promoter," those duties are not the liability

---

[16]     In addition, absent extraordinary circumstances, presenting an argument for the first time in a reconsideration motion is an insufficient basis to present an argument to a trial court. *See, e.g., Caisse Nationale de Credit Agricole v. CBI Indus., Inc.*, 90 F.3d 1264, 1270 (7th Cir. 1996). Presenting arguments for the first time in the context of a reconsideration motion is also insufficient to preserve the points for appeal. *See, e.g., Green v. Whiteco Industries, Inc.*, 17 F.3d 199, 201 n.4 (7th Cir. 1994).

concepts that the Holdens invoke in the complaint—or at least certainly not the liability concepts they primarily and repeatedly invoked, such as conspiracy and agency concepts.[17]

Accordingly, the Court finds no basis to reconsider Judge Gettleman's decision that Deloitte can enforce the Arbitration Clause under agency and related principles.

### iv. Third-Party Beneficiary Theory

Judge Gettleman also found that "the Holden contract . . . contain[s] a provision whereby the sellers acknowledge for the benefit of" Deloitte that Deloitte "was not related to EPS and that EPS and the individuals related to EPS with whom the sellers have dealt, have acted and will act on behalf of EPS and not . . . [Deloitte]. These provisions were intended to confer benefit on" Deloitte, "and under *Ms Dealer*, 177 F.3d at 947, appear to give . . . [Deloitte] . . . [an] additional right to enforce the agreement." *Hoffman*, 143 F. Supp. 2d at 1005. In the absence of the Court's rulings above concerning the other bases for Judge Gettleman's order, the Court would address this additional basis for Judge Gettleman's ruling at greater length. Nonetheless, the following discussion is likely warranted and sufficient.

As Judge Gettleman alluded, numerous federal decisions have permitted third-party

---

[17]    In addition, although the Court need not pass definitively on this issue, the Holdens' proffered authority in support of their "promoter" argument does not bear the weight they would place on it, at least as they (belatedly) present the argument. The word "promoter" appears nowhere in *Gratz v. Claughton*, 187 F.2d 46 (2d Cir. 1951), nor does it appear in *Chiarella v. United States*, 445 U.S. 222 (1980). Both cases appear to deal with duties of insiders with respect to insider trading. *Chiarella*, for example, reversed a conviction for what was presented to the jury as illicit stock trading by an employee of a printer who learned inside information about corporate takeover bids through his job and then traded on that information. *See id.* at 224-25. Whatever special duties attend "promoters" as opposed to more vanilla "agents," and whatever liability one might otherwise bear as a "promoter," as opposed to a co-schemer or coconspirator, the Holders have failed to establish either that the distinction is material in this case, or that the facts alleged in the complaint make any distinction relevant.

beneficiaries to enforce arbitration clauses. *See, e.g., Collins v. Int'l Diary Queen, Inc.*, 2 F. Supp. 2d 1465, 1468, 1471 (M.D. Ga. 1998); *Kmart Corp. v. Balfour Beatty, Inc.*, 994 F. Supp. 634, 635-37 (D.V.I. 1998). In *MS Dealer*, the Eleventh Circuit stated that nonsignatories to a contract are allowed to compel arbitration "when the parties to a contract together agree . . . to confer certain benefits thereunder upon a third party, affording that third party rights of action against them under the contract." 177 F.3d at 947 (citation omitted).

The Holdens contend that the provisions of the SPA should be interpreted pursuant to California law, rather than federal law, to determine whether Deloitte can invoke the SPA between the Holdens and EPS. Notably, although the Holdens principally cite three California decisions in support of their contention, those decisions appears to be materially distinguishable and, with all respect, less relevant than *Metalclad Corp. v. Ventana Envtl. Org. P'Ship*, 109 Cal. App. 4th 1705 (Cal. App. Ct. 2003). That decision, as explained, held that whether a nonsignatory to an agreement that contained an arbitration clause may rely on it to compel a signatory to arbitration "is answered by federal law, not state law." *Id.* at 1712 (citation omitted). *Metalclad* then proceeded to analyze and apply a number of the same decisions that Judge Gettleman did in ordering the Holdens to arbitration, including *MS Dealer*. None of this is particularly helpful to the Holdens.

In addition, the California cases the Holdens principally cite seem less relevant than the holding of the California Court of Appeals in *Metalclad*. The principal case the Holdens cite is *Whiteside v. Tenet Healthcare Corp.*, 101 Cal. App. 4th 693 (Cal. App. Ct. 2002). (*See* Holden Mem. at 5-6; Reply (D.E. 101) at 3). In *Whiteside*, the court refused to allow Tenet Healthcare Corporation ("Tenet") to enforce a fee-shifting provision in a contract between it and Blue

30

Cross/Blue Shield against an insured individual who became embroiled with Tenet in a payment/reimbursement dispute concerning medical treatment, when Tenet sought some $180,000 in attorneys fees from the insured individual. *Whiteside* did not involve any disputed arbitration question, and the factual scenario in the case is quite far afield from this one. Moreover, the *Whiteside* court noted that Tenet had, in the contract at issue, "disclaimed any obligations with regard to its handling of legal matters arising between it and Blue Shield subscribers, whereas elsewhere it had agreed to arbitrate disputes between it and Blue Shield and that the prevailing party in proceedings to enforce the agreement would be entitled to attorneys fees." *Id.* at 709. Thus, even as to the fees question actually at issue, *Whiteside* understood Tenet to have effectively dropped any claimed right to attorneys fees from health insureds who lost in litigation, and that neither insureds nor Tenet could recover fees in such circumstances. *See id.*

*Bancomer, S.A. v. The Superior Court of Los Angeles County*, 44 Cal. App. 4th 1450 (Cal. App. Ct. 1996), which the Holdens also cite, likewise is not a case about arbitration. Rather, it denied mandamus relief to a litigant who wanted to invoke a forum selection clause so as to require litigation of a dispute in the courts of Mexico. *Bancomer* declined to order mandamus relief, and noted that "[i]ncident to the terms of the purchase agreement [to which Bancomer was not a party], Bancomer was named as the trustee. That is not enough. A review of the purchase agreement and the circumstances under which it was negotiated and signed fails to demonstrate that Koster and Reilly intended Bancomer to benefit from their transaction." *Id.* at 1459. In the case *sub judice*, however, as Judge Gettleman noted, Section 2.30 of the SPA "contain[ed] a provision whereby the sellers acknowledge for the benefit of" Deloitte, that

31

Deloitte "was not related to EPS and that EPS and the individuals related to EPS with whom the sellers have dealt, have acted and will act on behalf of EPS and not . . . [Deloitte]. These provisions were intended to confer benefit on" Deloitte. *Hoffman*, 143 F. Supp. 2d at 1005. The clear intent of Section 2.30 (unlike the contract in *Bancomer*) was to confer benefit on Deloitte, and thus *Bancomer* would seem to involve a materially different situation. Furthermore, *Bancomer* specifically noted that in that case, the third-party bank was alleged to have acted alone, there were no assertions of fraudulent conduct by any other person or entity, and there was no evidence of any intertwining business relationship between the third-party bank and any party to the contract at issue. 44 Cal. App. 4th at 1458-59. That reasoning would appear to suggest that enforcement of the arbitration provision against the Holdens is appropriate as to their claims against Deloitte. Those claims, of course, are interlaced with allegations of conspiracy and concerted misconduct with the codefendants, including EPS, all culminating in the EPS/Holdens SPA in which the arbitration clause appears and in which various alleged fraudulent misstatements were made.

The Holdens also cite *Murphy v. Allstate Ins. Co.*, 17 Cal. 3d 937 (1976), which teaches that "[a] third party should not be permitted to enforce covenants made not for his benefit, but rather for others." *Id.* at 944. Judge Gettleman did not question that principle, but rather found that the SPA contained acknowledgments clearly intended to benefit Deloitte—*see Hoffman*, 143 F. Supp. 2d at 1005—which acknowledgments centrally relate to the subjects put at issue by the Holdens' complaint. Under the circumstances, Judge Gettleman held that Deloitte could invoke the arbitration clause on the independent ground of third-party beneficiary status. *See id.* at 1005 and n.5 (citing *MS Dealer*, 177 F.3d at 947, and *Brinderson-Newberg Joint Venture v. Pacific*

*Erectors, Inc.*, 971 F.2d 272, 279 (9th Cir. 1992) (applying California law)). Although the issue

may be of little practical import, given the other bases for Judge Gettleman's ruling discussed

above, this Court is unpersuaded that the Holdens have satisfied the applicable standards for this

Court to disclaim Judge Gettleman's result on this issue.

In sum, the Holdens have not made a serious attempt to satisfy the applicable standards

for relief on a reconsideration motion or for a situation where a party seeks for one district court

to upend a ruling of its predecessor district court in an inherited case. Moreover, Judge

Gettleman found that arbitration was appropriate on three independent bases, the first two of

which, at least, seem clearly to be correct. The Reconsideration Motion is respectfully denied.

## III.    Confirmation or Vacatur of the Arbitration Award

Shortly after the Panel issued the Arbitration Award, the Holdens moved to vacate the

award and to set the case for trial. The Holdens do not request that any part of the Award be sent

back to the Panel for clarification or further explication. Deloitte filed a motion to confirm the

award. The Court first addresses the Holdens' motion to vacate.

### A.    The Holdens' Motion to Vacate

#### 1.    Standard of Review

The Seventh Circuit has repeatedly instructed that "[j]udicial review of an arbitration

panel's award is extremely limited." *Yasuda Fire & Marine Ins. Co. v. Cont'l Cas. Co.*, 37 F.3d

345, 349 (7th Cir. 1994) (citing *Carpenter Local 1027 v. Lee Lumber & Bldg. Material*, 2 F.3d

796 (7th Cir. 1993); *accord Nat'l Wrecking Co. v. Int'l Bhd. of Teamsters*, 990 F.2d 957, 960

(7th Cir. 1993) ("Arbitrators do not act as junior varsity trial courts where subsequent appellate

review is readily available to the losing party."); *Dean v. Sullivan*, 118 F.3d 1170, 1172 (7th Cir.

33

1997).  In this regard, "'[f]actual or legal errors by arbitrators—even clear or gross errors—do not authorize courts to annul awards.'"  *Flexible Mfg. Sys. Pty. Ltd. v. Super Prods. Corp.*, 86 F.3d 96, 100 (7th Cir. 1996) (quoting *Gingiss Int'l, Inc. v. Bormet*, 58 F.3d 328, 333 (7th Cir. 1995) (internal citations omitted for clarity)).  Or, put differently, "neither error nor clear error nor even gross error is a ground for vacating an award."  *IDS Life Ins. Co. v. Royal Alliance Assocs., Inc.*, 266 F.3d 645, 650 (7th Cir. 2001) (citing, *inter alia*, *Major League Baseball Players Assoc. v. Garvey*, 532 U.S. 504, 509 (2001)).

"The fact that an arbitrator makes a mistake, by erroneously rejecting a valid, or even a dispositive legal defense, does not provide grounds for vacating an award unless the arbitrator deliberately disregarded what she knew to be the law."  *Flexible Mfg. Sys.*, 86 F.3d at 100 (citing *Eljer Mfg., Inc. v. Kowin Dev. Corp.*, 14 F.3d 1250, 1255 (7th Cir. 1994)); *accord, e.g., Nat'l Wrecking*, 990 F.2d at 961 ("We will not set aside an arbitrator's award for factual or legal errors, as long as the award contains the honest decision of the arbitrator after a full and fair hearing of the parties.") (citation omitted); *Carter v. Health Net of Cal., Inc.*, 374 F.3d 830, 838 (9th Cir. 2004) ("As federal courts of appeals have repeatedly held, 'manifest disregard of the law' means something more than just an error in the law or a failure on the part of the arbitrators to understand or apply the law.  It must be clear from the record that the arbitrators recognized the applicable law and then ignored it.") (collecting numerous federal appellate authorities; internal quotation marks omitted).  Moreover, to manifestly disregard a law, it must be well-defined, explicit, and clearly applicable.  *See, e.g., Westerbeke Corp. v. Daihatsu Motor Co., Ltd.*, 304 F.3d 200, 208-09 (2d Cir. 2002) (collecting cases).  Internal inconsistencies within an arbitral judgment or opinion are not grounds for vacatur.  *See, e.g., id.* at 212 (citing *Saint Mary Home,*

34

*Inc. v. Serv. Employees Int'l Union, Dist. 1199*, 116 F.3d 41, 44-45 (2d Cir. 1997)).

"'Thinly veiled attempts to obtain appellate review of an arbitrator's decision' . . . are not permitted under the FAA.'" *Flexible Mfg.*, 86 F.3d at 100 (quoting *Gingiss Int'l*, 58 F.3d at 333). In addition to not reviewing for gross or clear factual or legal error, courts also do not review arbitration awards for sufficiency of the evidence. *Gingiss Int'l*, 58 F.3d at 333 (citing *Eljer Mfg.*, 14 F.3d at 1256).

Section 10(a) of the FAA sets forth the few narrow grounds on which an arbitration may be vacated: (1) the award was procured by fraud, corruption or undue means, (2) there was evident partiality or corruption on the part of the arbitrators, (3) the arbitrators were guilty of misconduct in refusing to postpone the hearing for sufficient cause shown, or in refusing to hear pertinent and material evidence or any other misbehavior which prejudices the rights of any party to the arbitration, or (4) the arbitrators exceeded their powers or executed these powers so imperfectly, that a mutual, final and definite award was not made. 9 U.S.C. §§ 10(a)(1)-10(a)(4). The Holdens principally contend that the Arbitration Award should be vacated because the Arbitrators "manifestly disregarded the law"—a judicial gloss that courts often have superimposed on the statute. (*See* Holden Mem. at 13); *see also Baravati v. Josephthal, Lyon & Ross, Inc.*, 28 F.3d 704, 706 (7th Cir. 1994) (discussing cases).

At least one panel of the Seventh Circuit has questioned whether the "manifest disregard" gloss is even legitimate. *Baravati*, 28 F.3d at 706; *see also id.* ("Judicial review of arbitration awards is tightly limited; perhaps it ought not be called 'review' at all."). Another panel, in a decision that prompted a more limited concurrence in judgment, stated that the 'manifest disregard' standard is so narrow that it "is limited to two only possibilities: an arbitral order

35

requiring the parties to violate the law (as by employing unlicensed truck drivers), and an arbitral order that does not adhere to the legal principles specified by contract . . . ." *George Watts & Son, Inc. v. Tiffany & Co.*, 248 F.3d 577, 581 (7th Cir. 2001). In so stating, the *George Watts* majority also emphasized (consistent with an extensive body of precedent that spans the decades) that neither "clear" nor "manifest" legal error is sufficient to displace the result of an arbitration. *See id.* at 579. While Judge Williams, who concurred in the judgment in *George Watts*, felt that the majority's formulation (with its focus on prohibiting the affirmative ordering of an illegal act) rendered the "manifest disregard" standard "effectively impotent," her separate opinion made clear that her conception of the "manifest disregard" standard was nonetheless quite narrow, and did not allow for vacating an arbitral award on the basis of mere clear or even gross error. *Id.* at 582 (Williams, J., concurring in judgment). Instead, she wrote, "[w]e ask whether she [*i.e.*, the arbitrator] affirmatively disregarded what she knew to be the law." *Id.* at 583.

This Court need not consider whether recent potential narrowing of the scope of review under the "manifest disregard" concept in *Baravati* and *George Watts* might be material in some different situations or other cases. In the case *sub judice*, this Court can assume *arguendo* that the "manifest disregard" standard allows for all of the (extraordinarily limited) review provided in the precedents discussed in the initial paragraphs of this level of review section (*e.g.*, *Flexible Mfg.*, *Gingiss Int'l*, *IDS Life Ins. Co.*, *Nat'l Wrecking*, and *Dean*, *supra*). Suffice to say that, under any view of the precedent, clear and manifest legal or factual error is not enough to vacate an award. This Court is not to review for sufficiency of the evidence. And the arbitrators must, to manifestly disregard the law and their duties, have deliberately disregarded what they knew to be the law. As explained below, the Holdens' challenge to the Award, reviewed under such

36

standards, fails.

2.    The Holdens Have Not Identified a Legitimate Basis to Find That the
      Arbitrators Manifestly Disregarded Their Duty and Governing Law

Even if everything the Holdens claim with respect to the Arbitration Award is accurate,

the Holdens have not demonstrated that the Panel exhibited a manifest disregard for the law.

Although the Court will address the Holdens' specific objections in more detail below, the Court

notes that the Holdens do not allege, nor does the record suggest, that the Arbitration Order

requires any party to violate the law. *See, e.g., George Watts*, 248 F.3d at 578. What is more,

even if the Arbitration Award has certain alleged errors, the Holdens have not shown that the

Panel deliberately disregarded what they knew to be the settled and clear-cut law. Under such

circumstances, the Holdens' objections are respectfully rejected. *Accord, e.g., Flexible Mfg.*, 86

F.3d at 100 (citing *Gingiss Int'l*, 58 F.3d at 333).

a.    The Loss Causation Issue

The Holdens assert that the Panel applied the wrong burden of proof and the wrong

standard of loss causation. (Holden Mem. at 12.) Absent from their motion, or for that matter,

from the Arbitration Award itself, is *any* serious suggestion that the Panel 'deliberately'

disregarded the law or that the governing law is well-defined and clear. To the contrary, the

Holdens acknowledge that it is unclear whether California law, the law governing the SPA, or

Illinois law, the law of the forum, should supply the burden of proof. (*Id.* at 15 & n.13.[18]) In this

---

[18]    Moreover, it bears mention that the Ninth Circuit has observed that California's
law of loss causation is far from clear or settled. *Shawmut Bank, N.A., et al. v. Kress Assoc., et
al.*, 33 F.3d 1477, 1495 (9th Cir. 1993). Specifically, the *Shawmut Bank* court observed that
"[t]he parties' and district court's confusing use of the term proximate cause . . . is
understandable, given the state [California] law context in which they were operating"; that the
term 'proximate cause' is "inappropriately used in California jury instructions to refer to cause in

37

regard, the Holdens' basis for their charge that the Panel applied the wrong burden of proof is the fact that the Arbitration Award states that certain witness testimony was not "conclusive." (Award at 8.) The Court finds that this language most reasonably is understood to evidence the Panel's determination regarding the credibility of certain testimony, not that it indicates the Panel's adoption of a particular standard of proof. At the arbitration, the Holdens conceded that it was their burden to prove loss causation. (D.E. 97, Ex. B, Tr. at 83.) The Holdens explained that they intended to discharge this burden through the testimony of Bruce Strombom, whom the Holdens suggested would be "the only loss causation expert you're going to hear from in this case." (*Id.*, Tr. at 89.) The Panel was certainly entitled to reject Strombom's testimony and find, contrary to the Holdens' claims, that the testimony of one of Deloitte's experts, Colin Blaydon, was more persuasive, or at least undercut Strombom to such an extent that the Holdens' claims failed. After weighing the evidence, the Panel held, unanimously, that the Holdens failed to prove their case and had failed on the issue of loss causation. (Award at 8-9.) None of this is consistent with any determination by this Court that the Panel appreciated that they needed to apply a particular rule of law (whether it be from California or Illinois) and decided to ignore it and apply some other rule as a matter, for example, of personal will. *Accord Flexible Mfg. Sys.*, 86 F.3d at 100 (citing *Eljer Mfg., Inc.*, 14 F.3d at 1255); *Nat'l Wrecking*, 990 F.2d at 961; *see also Am. Postal Workers Union v. Runyon*, 185 F.3d 832, 836 n.3 (7th Cir. 1999) ("[M]ere

---

fact"; and that "California courts have at times perpetuated the confusion." *Id.* (citing *Mitchell v. Gonzales*, 819 P.2d 872 (Cal. 1991)). The uncertainty of California law with respect to loss causation alone militates against the Holdens' claim that the Panel manifestly disregarded the law with respect to loss causation. *See Westerbeke Corp. v. Daihatsu Motor Co., Ltd.*, 304 F.3d 200, 209 (2d Cir. 2002); *accord, e.g., Carter v. Health Net of Cal.*, 374 F.3d 830, 838 (9th Cir. 2004) (citing, *inter alia, Prestige Ford v. Ford Dealer Computer Servs., Inc.*, 324 F.3d 391, 395 (5th Cir. 2003)).

ambiguity in the opinion accompanying the award is not grounds for vacating it."); *Westerbeke Corp.*, 304 F.3d at 208-09 (even internal inconsistencies within an arbitral judgment or opinion are not grounds for vacatur).

Moreover, and most significantly, given that the Holdens in essence contend that the Panel erred in their application of the burden of proof on the "proximate cause" issue, that is the sort of claim of legal error (or "clear" legal error, or "gross" legal error) that the Seventh Circuit has repeatedly counseled will not justify overturning an arbitral award. *See, e.g.*, *Flexible Mfg.*, 86 F.3d at 100 ("'[f]actual or legal errors by arbitrators—even gross or clear errors—do not authorize courts to annul awards.'") (quoting *Gingiss Int'l*, 58 F.3d at 333). Under settled precedent, arbitration awards can be wrong and that is not a basis to vacate them. *See, e.g.*, *Garvey*, 532 U.S. at 509 ("[T]he arbitrator's 'improvident, even silly, factfinding' does not provide a basis for a reviewing court to refuse to enforce an award.") (quoting *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 39 (1987)); *IDS Life Ins. Co.*, 266 F.3d at 650 ("neither error nor clear error nor even gross error is a ground for vacating an award") (collecting cases).

Notwithstanding the extensive body of Seventh Circuit precedent that dooms their challenge, the Holdens repeatedly point to *Anheuser-Busch, Inc. v. Local Union No. 744*, 280 F.3d 1133 (7th Cir. 2002)—perhaps because it is the only Seventh Circuit decision they cite in which an arbitral order was vacated. *Anheuser-Busch* involves a materially different scenario from the instant case, with an arbitrator who expressly stated that he was ignoring a collective bargaining agreement that he was bound to follow in favor of a "long-standing practice." *Id.* at 1136. In this case, by way of contrast, the Panel gave no hint that it acknowledged that a rule of

39

law was applicable and governed, but that it was choosing to follow a different course.

Moreover, *Anheuser-Busch* (which produced a fractured decision, with three opinions, including a dissent) certainly did not purport to break new ground or question the principles counseling in favor of extremely limited review discussed at length above. *See id.* at 1137 ("The Supreme Court recently reiterated that judicial review of an arbitrator's decision is limited, stating that 'the fact that a court is convinced [the arbitrator] committed serious error does not suffice to overturn his decision.'" (quoting *Garvey*, 532 U.S. at 509)); *see also id.* at 1148-49 (Easterbrook, J., dissenting) (gross error is not a basis to vacate an arbitral award). Simply put, the case *sub judice*, unlike *Anheuser-Busch*, does not involve a situation where the arbitrator has effectively repudiated the adjudicatory role and manifested that he is going to simply render an award "rooted in his own personal idea of industrial justice." *Id.* at 1144. In this regard, the Holdens similarly err when they attempt to analogize this case to a situation alluded to in *George Watts*, where a hypothetical arbitration would be required to "be resolved under Wisconsin law," but the arbitrator thereafter issued a "declaration that he prefers New York law, or no law at all" and rendered a decision on such basis. *Id.*, 248 F.3d at 579. Here, the Holdens point to nothing that suggests that the Panel knew of a governing principle or standard and abjured it based on personal whim, or a subjective sense of "street-justice," or on the basis of willful or manifest disregard of the law.[19]

---

[19]     Likewise, and with all respect, the Holdens seriously err when they suggest that *Baravati v. Josephthal, Lyon & Ross, Inc.*, 28 F.3d 704 (7th Cir. 1994), requires or counsels in favor of a district court reviewing the underlying legal rulings in an arbitration to see if the award should be confirmed. (*See* Holden Mem. at 14 ("Only after analysis of the Illinois law of defamation, and after deciding that no absolute privilege applied, did the Seventh Circuit conclude that the arbitrators had not failed to apply the relevant law, and affirmed the award.") *Baravati* stressed *repeatedly* how narrow review of an arbitral order should be. *See id.* at 706

40

Lastly in this regard, the Holdens err when they suggest that their legal error claims really are fairly seen as "manifest disregard" claims because the Panel was aware of the "right" legal rules (because, for example, the Holdens briefed their view of the "correct" law) and the Panel thereafter "refused to apply it." (Holden Mem. at 12.) Parties in arbitrations typically brief the relevant legal and factual questions—often in pre- and post-arbitration briefs that are much lengthier than those typically permitted in federal court. (In this case, for example, it appears that the parties were collectively permitted to submit some 140-pages of post hearing briefs alone. (D.E. 97 at 1.)) If a party's briefing of the "correct" legal rules (as that party saw them) and the panel's failure to apply that party's "correct" legal rules were enough to qualify as a "manifest disregard" scenario, then the repeated teaching of precedent, that even gross errors of fact or law are inadequate to vacate an arbitral award, would mean nothing. *Accord, e.g.*, *Flexible Mfg.*, 86 F.3d at 100 ("'Thinly veiled attempts to obtain appellate review of an arbitrator's decision' . . . are not permitted under the FAA.'") (quoting *Gingiss Int'l*, 58 F.3d at 333).

     b. Failure of the Arbitrators to Decide Certain Issues

The Holdens appear to allege that the Panel's Award should be vacated because the Panel reserved certain issues in the course of reaching a clear-cut bottom-line that the Holdens had failed to prove their case. (Holden Mem. at 17.) The Holdens do not cite a single case in support of their argument that the Award should be upended in such a circumstance.

---

("Judicial review of arbitration awards is tightly limited; perhaps it ought not be called 'review' at all."); *id.* ("[W]e do not allow the disappointed party to bring his dispute into court by the back door, arguing that he is entitled to appellate review of the arbitrators' decision."); *id.* (rejecting the idea that a court reviews even for clear error). *Baravati* supports the idea of extraordinarily limited review under the "manifest disregard" standard, not of the searching review the Holdens suggest.

The Court notes that the Holdens concede that they do not claim "that the arbitrators ignored everything, denied all claims, and went golfing (as in the extreme example given by the *IDS* court.)" (*Id.* at 18.) In making this concession, the Holdens reference *IDS Life Ins. Co. v. Royal Alliance Assocs., Inc.*, 266 F.3d 645 (7th Cir. 2001), which offered as an example of an unconfirmable award a situation where "the arbitrators said, 'We'd rather play golf today, so rather than consider the parties' claims we're simply denying all of them.'" *Id.* at 650. In such a scenario, *IDS Life Ins.* stated, the "the resulting award would not be considered a 'mutual, final, and definite award,' [under 9 U.S.C. § 10(a)(4)] or, perhaps, any award at all." *Id.*

This Court can certainly assume for present purposes that *IDS Life Ins. Co.* does not require an express statement by the arbitrators that they were abandoning the arbitral process and deliberative review in favor of a recreational diversion before their award would be infirm. Nonetheless, the thrust of the teaching in *IDS Life Ins. Co.*—which emphasized that even claims of manifest and dispositive error do not justify refusal to confirm an award (*see id.* at 650 (collecting cases))—is clear, and it does not support the Holdens. *Accord, e.g., Nat'l Wrecking*, 990 F.2d at 961 ("We will not set aside an arbitrator's award for factual or legal errors, as long as the award contains the honest decision of the arbitrator after a full and fair hearing of the parties"). In this case—where the arbitrators presided over an arbitration in which they heard testimony from dozens of witnesses over fifteen days, adjudicated some twenty evidentiary motions,[20] and then rendered a ten-page single spaced statement of the Panel's "Award and

---

[20]     The Award states that the parties filed "about 20 motions regarding discovery in which over 65 briefs were filed, many running 15 pages or more. Approximately 68 subpoena requests were submitted . . . for review and approval and a number were contested." (Award at 2.)

42

Reasons"—the arbitral process and explanation given by the Panel does not resemble the

"everyone loses because we're going golfing" scenario described in *IDS Life Ins. Co.* or any

reasonable analog to it.[21] To be sure, the Panel did not decide every possible issue: that is neither

novel or objectionable, as courts often decide no more than they deem necessary to resolve the

particular case before them. Such an approach is not normally considered illicit; indeed, at least

with respect to courts and judicial decisions, many people believe such an approach wisely

reflects restraint. *See generally, e.g., Air Courier Conf. of America v. Am. Postal Workers

Union*, 498 U.S. 517, 531 (1991) (Stevens, J., concurring in judgment) ("Faithful adherence to

the doctrine of judicial restraint provides a fully adequate justification for deciding this case on

the best and narrowest ground available."); *Allen v. Ferguson*, 791 F.2d 611, 615 (7th Cir. 1986)

(collecting cases and stating that, "in keeping with the notions of judicial restraint, federal courts

should not reach out to resolve complex and controversial questions when a decision may be

based on a narrower ground"). The Panel explained that it would reach the same result—*i.e.*, that

the Holdens failed to prove their case—irrespective of the issues reserved. (Award at 8-9

(reflecting the Panel's unanimous view that the Holdens failed to prove their case, regardless of

the resolution of various reserved issues).) The Holdens offer no authority to believe the Award

can be vacated under such circumstances.[22]

---

[21]     At the end of this extended proceeding, counsel for the Holdens thanked the Panel
for their attention. (*See* D.E. 97, Ex. B, Tr. at 3102-03 ("[W]e appreciate the time that the
arbitrators have put in and really how officially you've run the proceedings.").)

[22]     Moreover, to the extent it even matters under the applicable level of review, the
Holdens overstate the degree to which the Panel reserved its views about the subjects of which
the Holdens complain. For example, the Panel noted that the Holdens and their sophisticated
advisers "knew they didn't have current financial and operational information on EPS, yet
nevertheless opted to close the transaction." (Award at 7.) This is not language that one seeking

43

c.    Federal Rules of Evidence Challenge

The Holdens contend that the Arbitration Award must be vacated because the Panel allegedly made an evidentiary error. Although the exact basis of the Holdens' evidentiary objection is not particularly clear in their brief, it appears that they claim that the Panel improperly relied on evidence that was inadmissible and/or irrelevant. (Holden Mem. at 19-20.) Because the parties—via their amendment to the original arbitration agreement (*cf.* Note 2, *supra* (referencing Deloitte's judicial estoppel argument))—opted for application of the Federal Rules of Evidence, the Holdens contend that the "Arbitrators openly ignored the law they were required to apply and their Award must be vacated." (Holden Mem. at 20.)

The Court respectfully disagrees. First, as stated above, the Court finds that a significant basis for the Panel's decision was the credibility of the expert testimony offered by the Holdens

---

to prove fraud would likely find encouraging—*see generally, e.g., Am. Nat'l Bank & Trust v. AXA Client Solutions,* L.L.C., No. 00 C 6786, 2002 WL 1008480, at *2 (N.D. Ill. May 16, 2002) (Kocoras, J.) (to the extent fraud claims are based on a failure to disclose a material fact, plaintiff must establish that he would have acted differently if he had known of the allegedly material undisclosed facts); *In re Info. Res. Inc. Secs. Litig.,* No. 89 C 3772, 1994 WL 124890, at *5 (N.D. Ill. Apr. 11, 1994) (Williams, J.) (same)—and may help to explain why the Holdens did not exercise the option in this Court of asking for the Award to be sent back to the Panel for clarification but instead placed all of their eggs in the basket of demanding a new jury trial. *See generally Am. Postal Workers Union v. Runyon,* 185 F.3d 832, 836 n.3 (7th Cir. 1999) ("[M]ere ambiguity in the opinion accompanying the award is not grounds for vacating it"); *Publicis Communication v. True North Communications, Inc.,* 206 F.3d 725, 730 (7th Cir. 2000) (teaching that unclear awards may be sent back to the arbitrators for clarification, as opposed to vacating the award; "however, a court should avoid remanding a decision to the arbitrator because of the interest in a prompt and final arbitration.") (internal quotation marks and citation omitted). Similarly, the Arbitrators specifically "question[ed] whether facts or non-disclosures, viewed as so significant by Claimants years after the failure of EPS and institution of suits and arbitrations seeking to shift the loss, were, or would have been considered so material, at the time of the transaction, with the Claimants having the burden of proving that they were." (Award at 8.) This also is not encouraging language from a fact-finder for one trying to show fraud and, concomitantly, materiality.

44

regarding Deloitte's responsibility for EPS's collapse; the Panel's decision did not rely solely on the testimony offered by Deloitte.

Second, and more fundamentally, even if the Holdens' evidentiary objection were well-taken, it would not justify vacating the arbitral award. The Court notes that the Holdens have not cited any case where an evidentiary error in an arbitration was seen as a basis to upend an award. In fact, the Holdens did not cite any case in which the Seventh Circuit even entertained such a claim. Given that even clear and material legal error is not a basis for vacating the result of the arbitration—*e.g.*, *Flexible Mfg.*, 86 F.3d at 100—one might question whether a mere evidentiary issue ever could justify upending an arbitral result under applicable precedent. *See, e.g.*, *Garvey*, 532 U.S. at 509 ("[T]he arbitrator's "improvident, even silly, factfinding' does not provide a basis for a reviewing court to refuse to enforce an award.") (quoting *Misco*, 484 U.S. at 39); *Dean*, 118 F.3d at 1173 (arbitral litigants may not seek judicial review of "all but the most exceptional errors at arbitration"); *cf. United States v. Westbrook* 125 F.3d 996, 1007 (7th Cir. 1997) (even in an ordinary appeal regarding a district court trial, evidentiary issue reviewed for clear abuse of discretion).

This Court need not resolve this question—*i.e.*, whether an evidentiary error might be a cognizable basis for a court to refuse to enforce an arbitral award. The apparent approach in the few district court decisions cited which entertain such evidentiary claims is that the objector must show not only that the evidentiary ruling was incorrect, but also "that the error deprived the claimant of a fundamentally fair hearing." *In re A.H. Robins Co.*, 238 B.R. 300, 311 (Bankr. E.D. Va. 1999) (collecting district court cases); *In re Crysen/Montenay Energy Co.*, No. 97 C 5072 (MGC), 1999 WL 681487, at *14 (S.D.N.Y. Aug. 31, 1999).

Deloitte contends, and the Holdens do not dispute, that the Panel presided over a fifteen day evidentiary hearing, at which it heard from dozens of witnesses and received hundreds of exhibits. (D.E. 97 at 1.) During the course of these proceedings—again, according to Deloitte and unchallenged by the Holdens (*id.* at 18 n.18)—the Panel ruled on numerous motions in limine and evidentiary objections. Under such circumstances, the single evidentiary error suggested (assuming it is even error, as the issue is presented in rather abbreviated fashion) cannot fairly be seen as depriving the Holdens of a fundamentally fair hearing process.

Moreover, to the extent that the Holdens are claiming that the allegedly inadmissible and/or irrelevant evidence was a substantial evidentiary foundation for the Panel's ruling, that claim is also one that does not warrant a different outcome. The Seventh Circuit has repeatedly held that "insufficiency of the evidence is not a ground for setting aside an arbitration award under the FAA." *Gingiss Int'l*, 58 F.3d at 333 (citing *Eljer Mfg.*, 14 F.3d at 1256). As such, the claim fails.

d.     Reasoned Award Challenge

The Holdens contend that the Arbitration Award should be vacated because it is not a "concise statement regarding the reasons for the disposition of any claim," as required by the Arbitration Agreement and amendment thereto. (Holden Mem. at 20.) According to the Holdens, "[u]nder AAA rules (R42) this requires at least a 'reasoned award,' if not findings of fact and conclusions of law." (Holden Mem. at 20.)

The Court again respectfully disagrees. First, the Court finds that the "Award and Statement of Reasons" section of the Arbitration Award is, in fact, a concise statement providing

46

the reasons for the disposition of the Holdens' claims against Deloitte. *See, e.g., ARCH Dev. Corp. v. Biomet, Inc.*, No. 02 C 9013, 2003 WL 21697742, at *4-*5 (N.D. Ill. July 30, 2003) (Zagel, J.). In *ARCH Development*, Judge Zagel observed that a "reasoned award" is "something short of findings and conclusions but more than a simple result." *Id.* at *4. The Arbitration Award certainly provides "more than a simple result"—within the ten-page single-spaced award, it provides four single-spaced pages articulating the Panel's statement of reasons.

In addition, as Judge Zagel noted,

> Even if the [] [a]ward were not a reasoned award by some unstated definition, that does not provide a basis on which it can be vacated. [The Objector] has cited no cases supporting the proposition that failure to provide a reasoned award is a basis for vacating an award. Further, failure to provide a reasoned award cannot form the basis for finding that the Arbitrator exceeded his powers. Indeed, it is very strange to assert that an arbitrator has exceeded his powers by not doing enough.

*Id.* at *5, n. 4.[23]

For all of the reasons mentioned above, the Court denies the Holdens' motion to vacate the Arbitration Award.

B.   Deloitte's Motion to Confirm

"[I]f the district judge is satisfied that the arbitrators resolved the entire dispute and can figure out what that resolution is, he must confirm the award." *IDS Life Ins. Co.*, 266 F.3d at 650-51. Here, the parties expressly agreed that "[t]o the extent permissible under applicable law,

---

[23]      To the extent the Holdens believed that the Award was somehow incomplete, they could have—but did not—filed a motion requesting that the Court send the Award back to the Panel for further elaboration. The Holdens (likely strategic) decision to seek only a jury trial in district court is not a basis for ignoring precedent concerning applicable standards of review or for vacating the Award.

the award of the Arbitrators shall be final." (Arbitration Agreement at ¶ 18.) Moreover, the Arbitration Award expressly states the Panel's intent with respect to the finality of the award. (Award at 10 ("[T]he rendering of this Award concludes the work of this panel.").)

"[T]he FAA provides that, upon proper application of a petition to confirm an arbitration award, a federal court 'must grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title.'" *ARCH Dev.*, 2003 WL 21697742 at *3 (quoting 9 U.S.C. § 9)); *accord Int'l Union of Operating Eng'rs, Local No. 841 v. Murphy Co.*, 82 F.3d 185, 188 (7th Cir. 1996). Deloitte has moved to confirm. Confirming an arbitration award is a "summary proceeding that merely makes what is already a final arbitration award a judgment of the court." *Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us, Inc.*, 126 F.3d 15, 23 (2d Cir. 1997) (internal quotation omitted).

For the reasons stated above, the Court finds no basis for it to disturb Judge Gettleman's prior order or to vacate the Arbitration Award. Accordingly, the Court confirms the Arbitration Award.

## IV.    Conclusion

The Court grants Deloitte's motion to confirm the Arbitration Award (D.E. 92), and

denies the Holdens' motion to vacate Arbitration Award, to Reconsider Arbitration Order, and to

Set Case for Jury Trial (D.E. 89).

So ordered.

Mark Filip
United States District Judge
Northern District of Illinois

Dated: 9/29/05